# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Wilmington*, 2013 IL 112938

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LAMAR WILMINGTON, Appellant. |
| Docket No. | 112938 |
| Filed | February 7, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A defendant's right to decide whether to submit a lesser-included-offense instruction did not apply to the mitigated offense of second degree murder; and failure to fully question prospective jurors as required by rule, though error, did not call for reversal where plain error was claimed only for evidentiary closeness and the burden of showing that was not met. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Thomas V. Gainer, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal     Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Brian E. Koch, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Annette Collins and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People.

Justices     JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Thomas, Garman, and Theis concurred in the judgment and opinion.

Justice Burke dissented, with opinion, joined by Justice Freeman.

**OPINION**

¶ 1     Following a jury trial in the circuit court of Cook County, defendant, Lamar Wilmington, was convicted of first degree murder and concealment of a homicidal death. He was sentenced to consecutive prison terms of 50 and 5 years, respectively. Defendant appealed, arguing that he was denied a fair trial insofar as: (1) the circuit court did not ascertain that he consented to his counsel's tender of a jury instruction on second degree murder; and (2) the circuit court did not fully comply with the *voir dire* requirements of Illinois Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)). The appellate court rejected defendant's first argument, concluding that the trial court was not required to ascertain whether defendant agreed to his counsel's tender of the pertinent instruction; however, the appellate court found that the circuit court's questioning of potential jurors did not fully comply with Rule 431(b), and that error necessitated reversal and remand for a new trial. 394 Ill. App. 3d 567. This court subsequently issued a supervisory order directing the appellate court to vacate its judgment and reconsider in light of our decision in *People v. Thompson*, 238 Ill. 2d 598 (2010) (holding, given the facts there extant, that the trial court's omissions in Rule 431(b) questioning did not qualify as structural, second-prong plain error, which would require automatic reversal). On remand, the appellate court determined that the trial court's Rule 431(b) omissions did not warrant reversal under either prong of plain-error analysis—as the evidence was not closely balanced and there was no evidence that defendant was tried by a biased jury. With respect to defendant's instructional issue, the appellate panel on remand took a position different from that of the original appellate panel, holding that the trial court erred when it failed to inquire whether defendant consented to the tender of a second degree murder instruction, but the error did not rise to the level of plain error. 2011 IL App (1st) 072518-B. We allowed the defendant's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), and now affirm the judgment of the appellate court, though we

do not accept its reasoning *in toto*.

¶ 2                                    BACKGROUND

¶ 3        The core facts that follow are taken from the transcript of defendant's trial. Additional facts pertinent to the issues will be set forth, as necessary, in the analysis of each issue. We note, prior to trial, a motion to quash defendant's arrest and suppress evidence—including his confession—was denied by the circuit court.

¶ 4        On March 4, 2004, the body of Guan McWilliams was found in a garbage can at 7446 South Eberhart in Chicago. An autopsy revealed that McWilliams had been shot twice in the top of the head.

¶ 5        Approximately one week later, defendant appeared at the Third District police station and stated he had information concerning a person who had been killed in the vicinity of 74th Street and Eberhart. Defendant told detectives he had been at a party and had overheard a man identified as "Dollar" say that he had killed a "gay" man and had thrown him in the garbage. Acting upon that information, police interviewed Dollar and eliminated him as a suspect.

¶ 6        On June 14, 2004, defendant again appeared at the police station and, on that occasion, reported that his head had been grazed by a bullet. After investigating defendant's complaint, Detective Gerald Hamilton advised defendant of his *Miranda* rights, and informed defendant that he had questioned Dollar and had ruled him out as a suspect. According to Hamilton, defendant appeared visibly shaken and then admitted he had lied about Dollar.

¶ 7        Detective Robert Myers testified that he and other officers spoke with defendant on June 15 after advising him of his *Miranda* rights. Thereafter, they went with defendant to look for two witnesses named Ram and Stennis. Unable to locate those individuals, they proceeded to defendant's home at 7318 South Eberhart. Earlier that morning, defendant had consented to a search of his residence. Defendant showed the detectives his bedroom in the basement of the residence, where McWilliams had allegedly been shot. Defendant told the officers that the condition of the room had changed since the night of the murder. Drywall had been put in, a rug was put down on the concrete floor, and some additional furniture had been placed inside.

¶ 8        Detective Myers testified that defendant was returned to the Area 2 station after the search, where he remained for the next two days, except for two trips to a police facility at 1819 West Pershing. During that time, the detectives continued the investigation, looking for other witnesses.

¶ 9        Assistant State's Attorney George Canellis took defendant's handwritten statement on June 17, with Detective Myers present. In the statement, defendant said that he met McWilliams at the Jeffery Pub's "gay night" in January 2003. He and McWilliams had oral and anal sex three or four times over the next year. Defendant said no one knew he had "gay sex," including members of his gang, the Black Disciples, who did not like homosexuals. Defendant stated, on March 3, 2004, McWilliams called him and asked for $200. Defendant told McWilliams he did not have $200, but he encouraged McWilliams to come over anyway. When McWilliams arrived, no one else was at defendant's residence. Defendant

-3-

admitted to Canellis that he and the victim engaged in consensual sex acts, but he did not elaborate any further on this subject in his statement.

¶ 10     After the sexual activity, McWilliams asked for $200 and told defendant he would be charging for sex. Defendant and McWilliams argued, and McWilliams threatened to tell the police that defendant had raped him. McWilliams also told defendant that he had AIDS. Defendant stated that McWilliams then produced a dark automatic gun, but defendant was able to get the gun away from McWilliams because defendant was bigger and stronger. The argument continued, defendant calling McWilliams a "little bitch." McWilliams threatened to tell people in the neighborhood that they were having sex. Defendant told Canellis he did not want people in the neighborhood to know he had sex with McWilliams. Defendant stated, while he held the gun, McWilliams, whom defendant described as naked and unarmed, ran at him. Defendant believed that he fired about four shots, striking McWilliams in the top of the head. Defendant said McWilliams fell to the floor, bleeding, and he appeared to be dead.

¶ 11     Defendant stated he then put underwear and a shirt on McWilliams, hid the gun, and dragged McWilliams' body outside onto the sidewalk. Defendant went to get help from a fellow gang member named Ramsey. Defendant told Ramsey he killed McWilliams when a drug deal went bad. Defendant stated that Ramsey came back to the house with him and told him to put the body in a garbage can. Defendant got a garbage can nearby, picked up McWilliams' body, and threw it into the can. He and Ramsey then wheeled the can about a block away and left it there. Defendant said he used bleach to clean the floor, and he threw out the shell casings and the rest of McWilliams' clothes. He gave the gun to another fellow gang member.

¶ 12     Defendant told Canellis he had initially implicated Dollar because he and Dollar had fought over a girl. He told Canellis when he went to the police station on June 14, to report the incident in which a bullet had grazed his head, he also talked to the police about McWilliams' murder. Defendant said he initially implicated Ramsey in the killing because he was frightened. Defendant told Canellis, at the time of his statement, that he was telling the truth because he wanted to clear his conscience.

¶ 13     After Canellis took down the statement, he and defendant began to review it. They read through the *Miranda* warnings on the first page, and Canellis then asked defendant to sign underneath the warnings. Defendant refused to sign any part of the statement, but he did agree to sign a Polaroid photograph of himself taken by Canellis at the time of the interview.

¶ 14     Stipulations were entered of record indicating, in essence, that no inculpatory evidence was obtained from defendant's residence, and no fingerprints suitable for comparison were obtained from the garbage can in which McWilliams' body was found. Further, the garbage can in which the body was discovered had been assigned to a vacant building which shared a common alley with defendant's residence. Finally, the articles of clothing found on McWilliams' body included a T-shirt, boxer shorts, a shirt, a sweatshirt, jeans, socks, and a nylon cap known as a "do-rag."

¶ 15     Dr. Nancy Jones, the medical examiner, testified to the angles by which two bullets entered and traveled through McWilliams' skull. Jones said she found no evidence of close-

-4-

range firing, *i.e.*, discharge of the weapon between 18 to 24 inches from the body. She did not take any rectal or oral swabs and did not see any apparent semen. Dr. Jones indicated she found blunt trauma injuries on McWilliams' body consisting of large abrasions or scratches and some bruising on the back that occurred around the time of death. Some of the abrasions were consistent with McWilliams' body having been dragged on the sidewalk after he was shot; the bruises were consistent with the body having been dropped on the sidewalk after the shooting. Jones testified that McWilliams' blood-alcohol level was twice the legal limit.

¶ 16    Dr. Robert Hanlon, a clinical neuropsychologist, testified on behalf of defendant. Hanlon placed defendant's mental functioning in the range of mild mental retardation. He stated that an intelligence quotient (IQ) below 70 is indicative of mental retardation, and he acknowledged that defendant, with a full-scale IQ of 67, is "really on the high end of being mildly mentally retarded." Hanlon opined that defendant reads at a first-grade level. Hanlon also testified, based on defendant's medical records, that defendant has a seizure disorder, which, Hanlon suggested, would have made it unlikely that he could have committed the crime without suffering a seizure. Hanlon, however, admitted that the State's version of events was "certainly possible." Moreover, Hanlon admitted that defendant's history of seizures was largely "self-reported."

¶ 17    In rebuttal, the State called Alesia Hines, a paramedic with Cermak Health Services. Hines testified that she questioned defendant about the date of his last seizure, and he told her that his last seizure had been in 1995. The State also called Dr. Dawna Gutzmann, a staff psychiatrist with Forensic Clinical Services, who had interviewed defendant several times. Defendant told *her* that he had a seizure in 2002, and he then starting having seizures frequently in the year leading up to his arrest. Gutzmann concluded that there was some evidence of malingering. Defendant had reported to another doctor that he was having seizures in the courtroom, that he would sometimes have none for a month, but then would have three or four in a day. Gutzmann stated her opinion that defendant had no mental or physical disorder that would have affected his ability to commit the alleged offense.

¶ 18    On July 27, 2007, as the parties anticipated closing argument and instructions to the jury, the trial judge addressed the prosecutor, acknowledging receipt of a set of jury instructions prepared by the State, and inquiring whether a set had been given to the defense. The prosecutor responded affirmatively. The court then stated: "I understand they [referring to the defense] have asked you to prepare a second degree instruction?" The prosecutor again responded affirmatively, and indicated that would be done.

¶ 19    When court reconvened on July 30, 2007, the trial judge, addressing defense counsel, stated, "you also requested that I give second-degree." Defense counsel indicated he had. The court then announced: "I have considered the status of the evidence in this case, and I believe it appropriate to give the second-degree murder instruction." The instructions to be given were reviewed in defendant's presence and for his benefit. It is not clear, however, whether defendant understood the import of those instructions, as the record does not indicate they were explained to him.

¶ 20    In his closing argument, defense counsel questioned the reliability of defendant's alleged statement to the police, pointing up the circumstances under which it was given and the

dearth of physical evidence that would link defendant to the murder. Counsel briefly referenced the second degree murder instruction the jury would receive: "[I]t's not because we're asking you to do that. It's because the facts indicate if it's anything, that's what it is. *** [I]f it's anything, it's second-degree murder."

¶ 21 In conjunction with the first degree murder instruction given the jury, jurors were told the State, in order to prove defendant guilty of first degree murder, had to establish, *inter alia*, that the defendant was not justified in using the force which he used. In that regard, the jury was instructed pursuant to Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th): "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force," and "a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." As part of the first degree murder instruction, after the stated propositions to be proved by the State, the jury was cautioned it could "not consider whether the defendant [was] guilty of the lesser offense of second degree murder until and unless you have first determined that the State has proved beyond a reasonable doubt each of the previously stated propositions." IPI Criminal 4th No. 7.04. In that event, the jurors were told they could then consider whether defendant acted under an unreasonable belief that the circumstances justified the use of deadly force, such that a verdict of second degree murder would be warranted. IPI Criminal 4th No. 7.04.

¶ 22 During deliberations, the jury sent three notes pertaining to exhibits or evidentiary matters. The final note was sent out approximately 2 hours and 40 minutes after the start of deliberations. The jury ultimately found defendant guilty of first degree murder and concealment of a homicidal death. As indicated, defendant was sentenced to prison terms of 50 and 5 years, respectively, for those crimes.

¶ 23 The issues raised in the ensuing appeal, and the appellate court's resolution of those issues, were matters outlined at the outset of this opinion, and our disposition does not require further elaboration at this juncture.

¶ 24                                          ANALYSIS

¶ 25 Before this court, defendant argues that his convictions should be reversed, and the cause remanded for a new trial, because: (1) the trial judge failed to question prospective jurors about their understanding and acceptance of defendant's right not to testify, and failed to question them about the three other principles enumerated in Rule 431(b); and (2) the trial court agreed to give an instruction on second degree murder, but never asked defendant if he agreed with the tender of the instruction and understood its consequences.

¶ 26 We first determine whether the trial court violated Supreme Court Rule 431(b), and if it did, what consequences should flow from noncompliance with this court's rule. Our review of these questions is *de novo*. See *People v. Thompson*, 238 Ill. 2d 598, 606-07 (2010).

¶ 27 The version of Rule 431(b) in effect when defendant was tried provided:

"(b) The court shall ask each potential juror, individually or in a group, whether

-6-

that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 28    In this case, prior to the *voir dire* of individual panel members, the trial judge admonished the entire group of potential jurors about each of the principles set forth in the rule:

"Mr. Wilmington[,] as with other persons charged with crimes[,] is presumed to be innocent of the charges that bring him before you. *** It is absolutely essential as we select this jury that each of you understand and embrace these fundamental principles; that is, that all persons charged with a crime are presumed to be innocent and that it is the burden of the state who has brought the charges to prove the defendant's guilt beyond a reasonable doubt.

What this means is that the defendant has no obligation to testify in his own behalf or to call any witnesses in his defense. He may simply sit here and rely upon what he and his attorneys perceive to be the inability of the state to present sufficient evidence to meet their burden. Should this happen, you will decide this case on the basis of the evidence presented by the prosecution. The fact that *** the defendant chooses not to testify must not be considered by you in any way in arriving at your verdict."

Later, in the course of admonitions, the trial court again addressed Rule 431(b) principles:

"I spoke to you earlier about some fundamental principles of law. I want to ask you as a group one more time about these fundamental principles. ***

I have spoke[n] about the fact the defendant is presumed to be innocent of the charges against him and that this presumption stays with the defendant throughout the trial and is not overcome unless and until the jury determines the defendant is guilty beyond a reasonable doubt.

Is there anyone in the courtroom here in the jury box amongst you who disagrees with this fundamental principle of law? If so, please raise your hand."

The court noted that no hands were raised. The court then inquired:

"I also spoke about the fact the State has the burden of proving the defendant guilty beyond a reasonable doubt. Is there anyone among you *** who disagrees with this fundamental principle of law? If so, please raise your hand."

The circuit court continued:

"Because the defendant is presumed to be innocent, he does not have to present any

-7-

evidence at all in this case. He can simply rely on the presumption of innocence. Is there anyone among you *** who disagrees with this fundamental principle of law? If so, please raise your hand."

After asking each question to each group of jurors, the circuit court noted: "The record should reflect no hands are raised."

¶ 29    After closing arguments, the instructions the jurors were given, and sworn to follow, reiterated the four Rule 431(b) principles.

¶ 30    Defendant now contends that the trial judge violated Rule 431(b) in that he did not ask prospective jurors whether they understood and accepted the principle that they could not hold it against defendant if he exercised his right not to testify, and the judge also erred by asking only whether the prospective jurors accepted the other three principles enumerated in the rule, but not asking whether they also *understood* those three principles.

¶ 31    Defendant did not object to the court's questioning during *voir dire*, and he did not raise this issue in a posttrial motion; therefore, any claimed error must be the subject of plain-error analysis. See *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005). The plain-error doctrine allows errors not previously challenged to be considered on appeal if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). We first consider whether error occurred.

¶ 32    As this court stated in *Thompson*, Rule 431(b) requires that the trial court ask potential jurors whether they *understand* and *accept* the enumerated principles, mandating "a specific question and response process." *Thompson*, 238 Ill. 2d at 607. While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself. Moreover, the trial court did not even inquire regarding the jury's understanding and acceptance of the principle that defendant's failure to testify could not be held against him. Thus, error clearly occurred.

¶ 33    The next question is whether the error necessitates reversal and remand for a new trial pursuant to application of plain-error review. In that regard, defendant addresses our recent decision in *Thompson*, and so will we. In *Thompson*, defendant argued only the second prong of plain error, *i.e.*, that "the violation of Rule 431(b) infringed his right to an impartial jury, thus affecting the fairness of his trial and challenging the integrity of the judicial process." *Thompson*, 238 Ill. 2d at 613. The prospective jurors in this case, as in *Thompson* (see *Thompson*, 238 Ill. 2d at 615), received some, but not all, of the required Rule 431(b) questioning, and the venire was also admonished and instructed on Rule 431(b) principles. As in *Thompson* (see *Thompson*, 238 Ill. 2d at 615), defendant has not established that the trial court's violation of Rule 431(b) resulted in a biased jury. As in *Thompson* (see *Thompson*, 238 Ill. 2d at 615), the second prong of plain-error review does not provide a basis for excusing defendant's procedural default.

¶ 34    Defendant does not argue otherwise. Instead, defendant contends that reversal is

indicated by application of the first prong of plain error, *i.e.*, that the evidence is so closely balanced that the error alone threatened to tip the scales of justice against him. Like the appellate court (2011 IL App (1st) 072518-B, ¶ 38), we conclude that the evidence was not closely balanced and thus the first prong of plain-error analysis is unavailing.

¶ 35    First, although the jury sent notes to the judge during the deliberative process, there is no indication in the record that the jury at any time had reached an impasse or that the jurors themselves considered this a close case. The record does not disclose the length of deliberations. Careful consideration of the evidence adduced and exhibits admitted is what we expect of jurors in any trial. We have no reason to believe that deliberations here were in any way extraordinary.

¶ 36    Second, testimony of expert witnesses for the State and the defense does not render this case closely balanced. Dr. Gutzmann testified that she did not believe defendant had any mental or physical disorder that would have rendered him incapable of committing the crime. She noted that defendant gave different stories regarding the frequency of his alleged seizures, and there was some evidence of malingering on his part. While defendant's expert, Dr. Hanlon, testified that defendant's mild mental retardation and his seizure disorder would have made it *difficult* for him to commit the crime, he conceded it was "certainly possible" that defendant had committed the offense. Hanlon also admitted that defendant's history of seizures, upon which Hanlon based his opinions, was largely "self-reported."

¶ 37    Third, there was unrebutted evidence in this case that defendant gave an inculpatory statement, and there was some physical evidence corroborating that statement.

¶ 38    Initially, we note, it is undisputed that defendant interjected himself into the investigation of McWilliam's murder by appearing, unsolicited, at the police station and falsely apprising investigators that he had information that "Dollar" had killed McWilliams. When defendant later returned, voluntarily, to the station to report a separate alleged crime, he was confronted with the results of the police investigation to that date, ruling out Dollar as a suspect. He then admitted he had lied about Dollar, an admission which no doubt focused the investigation on defendant himself. Thereafter, defendant provided the police with additional names and attendant information—leads that were pursued and came to nothing, but which prolonged the investigation and the period of time in which defendant was in the company of officers. In the course of the investigation, defendant consented to a search of his residence and accompanied the police there. While at that location, he told them that significant changes had been made to the room since the time of McWilliams' murder.

¶ 39    There is uncontradicted evidence that defendant gave a statement wherein he admitted he shot and killed McWilliams and he described how he disposed of the body. Certain known forensic details corroborate information provided by defendant in his statement. Defendant stated that he shot the shorter McWilliams in the top of the head as McWilliams was hunched over and charging at him; consistent with that description of events, the medical examiner testified that McWilliams suffered two bullet wounds to the top of the head, in each case the bullets taking a downward path through the skull. Defendant stated that he dragged McWilliams' body outside after the shooting and left it on the sidewalk; the medical examiner testified that the body bore scratches and bruises consistent with the body having

been dragged and dropped on the sidewalk. Defendant testified that he placed McWilliams' body in a neighbor's garbage can, and he and Ramsey wheeled it about a block away; McWilliams' body was found in a garbage can located about a block away from defendant's residence, and that garbage can was registered to a location across the alley from defendant's residence.

¶ 40    The absence of some forensic evidence one might expect is easily explained. Though the medical examiner did not see evidence of semen in or about McWilliams' body, that fact alone does not exculpate defendant, as defendant did not indicate to Canellis whether the men had engaged in protected sexual activity, which, of course, would explain the absence of such physical evidence. Although no evidence of import was recovered from defendant's bedroom, where the murder is said to have occurred, *i.e.*, no bullet holes or indicia of blood, defendant, in his statement, indicated that he had cleaned the floor with bleach and that drywall had been installed in the interior of the room after the shooting.

¶ 41    While one might question why defendant subsequently "changed his mind," and declined to sign his statement, his refusal to sign could have been attributable to any number of reasons, not the least of which was his reluctance to be associated with admissions that he had engaged in "gay sex." We note there is nothing of record that would indicate defendant's statement to Assistant State's Attorney Canellis was untrue or coerced. Defendant in fact acknowledged to Canellis, outside the presence of the police officers, that he had been "treated pretty good since he had been at the police station," and that "he was giving the statement freely, voluntarily, no threats or promises made to him in order to get him to give the statement."

¶ 42    The only inconsistency of any significance between defendant's statement and the physical evidence in this case is defendant's assertion that he dressed McWilliams' naked body in boxer shorts and a T-shirt before he placed the body in a garbage can. The body was actually found clad in a T-shirt, boxer shorts, a shirt, a sweatshirt, jeans, socks, and a nylon cap known as a "do-rag." We do not consider that lone inconsistency sufficient to render the evidence in this case closely balanced for purposes of first-prong plain error.

¶ 43    The defendant bears the burden of persuasion under both prongs of plain-error analysis. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). He has not met that burden with respect to this issue.

¶ 44    We next address defendant's contention that the trial court erred when it granted defense counsel's request for an instruction on second degree murder, but never asked defendant if he agreed with the tender of the instruction and understood its consequences. We acknowledge, in passing, the State's contention that the trial court, "on its own volition," directed the State to prepare the second degree murder instruction, and the State's citation to authority holding that a lesser-included offense instruction may be given at the insistence of the State, or by the trial judge *sua sponte*, even over defendant's objection. See generally *People v. Medina*, 221 Ill. 2d 394, 405 (2006) (citing *People v. Knaff*, 196 Ill. 2d 460, 473 (2001)). We reaffirm the principle espoused in the decisions cited by the State; however, the record in this case does not unequivocally support the State's assertion that the trial court gave the second degree murder instruction of its own accord, absent a request by the defense.

Consequently, the question of whether our holdings in *Medina* and *People v. Brocksmith*, 162 Ill. 2d 224 (1994), apply in this context are squarely before this court. In that regard, defendant insists that a defense request for a second degree murder instruction should be governed by the same legal principles that apply to requests for any lesser-included offense instruction. We disagree.

¶ 45     In *People v. Ramey*, 152 Ill. 2d 41, 54 (1992), this court acknowledged four decisions that ultimately belong to a defendant after consultation with his attorney: (1) what plea to enter; (2) whether to waive a jury trial; (3) whether defendant will testify on his own behalf; and (4) whether to appeal.

¶ 46     In *Brocksmith*, this court added another right to those enumerated in *Ramey*, holding that a defendant also has the right to decide whether to submit an instruction on a lesser-included offense at the conclusion of the evidence. *Brocksmith*, 162 Ill. 2d at 229. The court found the decision to tender a lesser-included offense instruction "analogous to the decision of what plea to enter," and determined that "the two decisions should be treated the same." *Brocksmith*, 162 Ill. 2d at 229.

¶ 47     In *Medina*, we reiterated the rationale for the *Brocksmith* rule, we addressed some of the practical considerations that bear upon its implementation, and we proposed a procedure to ensure that defendant's right is safeguarded:

> "Where a lesser-included offense instruction is tendered, a defendant is exposing himself to potential criminal liability, which he otherwise might avoid, and is in essence stipulating that the evidence is such that a jury could rationally convict him of the lesser-included offense. Consequently, when a lesser-included offense instruction is tendered, we believe the trial court should conduct an inquiry of defense counsel, in defendant's presence, to determine whether counsel has advised defendant of the potential penalties associated with the lesser-included offense, and the court should thereafter ask defendant whether he agrees with the tender." *Medina*, 221 Ill. 2d at 409.

We noted that the defendant in that case would not have been entitled to a lesser-included offense instruction, even if he had tendered one, because, in order for a defendant to be entitled to a lesser-included offense instruction, "the evidence must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater." *Medina*, 221 Ill. 2d at 410. It was not so in that case.

¶ 48     It is not so in this case. Second degree murder is not a lesser-included offense of first degree murder; rather, it is more accurately described as a *lesser-mitigated offense* of first degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995); *People v. Toney*, 2011 IL App (1st) 090933, ¶ 47. While a defendant who tenders a lesser-included offense instruction exposes himself to "potential criminal liability, which he otherwise might avoid if neither the trial judge nor the prosecutor seeks the pertinent instruction" (see *Medina*, 221 Ill. 2d at 405), that is not the case with the tender of a second degree murder instruction, as a defendant can only be found guilty of second degree murder if the State has first proven all the elements of first degree murder. Clearly, he is not exposing himself to "potential criminal liability which he might otherwise avoid." Thus, the rationale underpinning the decisions in *Brocksmith* and

-11-

*Medina* does not apply here.

¶ 49    Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *People v. Taylor*, 166 Ill. 2d 414, 438 (1995); *People v. Chromik*, 408 Ill. App. 3d 1028, 1046 (2011). Given that presumption, the jury here had two primary decisional options: find that the State had failed to prove defendant guilty of first degree murder, or find that the State had in fact proven him guilty of first degree murder. Only in the latter instance could the jurors then consider whether this mildly retarded defendant acted under an unreasonable belief that the circumstances justified the use of deadly force, such that a verdict on the lesser-mitigated offense of second degree murder would be warranted, an option that they, in any event, rejected.

¶ 50    Though defendant argues that defense counsel's request for a second degree murder instruction undermined counsel's strategy of challenging the reliability of defendant's alleged confession, and opened the way for the prosecutor to argue that defendant was proceeding on inconsistent theories, defendant, notably, does not argue that counsel rendered ineffective assistance. We observe that counsel, initially, sought suppression of defendant's confession. When that strategy of first resort proved unsuccessful, counsel tried, at trial, to convince the jury, through expert testimony, that defendant could not have committed the crime because of a seizure disorder. Counsel used the same testimony to apprise the jury of defendant's mental retardation and to lay the groundwork for his argument that defendant's alleged confession was the product of suggestion and overbearing behavior on the part of the police. Defense counsel was able to elicit some forensic evidence that was inconsistent with defendant's alleged statement to support that theory, a theory that was, with one brief exception, the sole basis of counsel's closing argument. However, in the event that strategy failed, and the jury found defendant *had* committed the murder, counsel had the jury instructed on second degree murder, without really arguing for it. Thus, the jury was at least given the option, if it believed the mentally retarded defendant had shot the victim, of finding that he unreasonably believed he was justified in defending himself.

¶ 51    We are not asked to rule upon the issue of trial counsel's effectiveness. In light of our holding, it was *defense counsel's* decision to pursue a strategy of questioning the reliability of the confession, but offering the jurors the option of second degree murder if that strategy failed and they found that defendant *did* in fact confess to the murder.

¶ 52    For the foregoing reasons, we affirm the judgment of the appellate court, finding, however, that the circuit court did *not* err when it failed to inquire whether defendant consented to the tender of a second degree murder instruction. See *People v. Burnett*, 237 Ill. 2d 381, 391 (2010) (this court is "in no way constrained by the appellate court's reasoning and may affirm on any basis supported by the record").

¶ 53    Affirmed.

¶ 54    JUSTICE BURKE, dissenting:

¶ 55    I respectfully dissent from the majority's opinion for the reasons set forth in my dissent

in *People v. Thompson*, 238 Ill. 2d 598 (2010), and *People v. Glasper*, 234 Ill. 2d 173 (2009). The questions required by Rule 431(b) are " 'vital to the selection of a fair and impartial jury' " (*Thompson*, 238 Ill. 2d at 619 (Burke, J., dissenting, joined by Freeman, J.) (quoting *People v. Zehr*, 103 Ill. 2d 472, 477 (1984)), and the circuit court's failure to ask them in this case necessarily amounts to plain error. Accordingly, I would reverse defendant's convictions and remand this cause for a new trial.

¶ 56       JUSTICE FREEMAN joins in this dissent.