NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230549-U

NO. 4-23-0549

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 9, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Lee County |
| GONZALO TREVINO JR., | ) | No. 20CF166 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jacquelyn D. Ackert, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant's predatory criminal sexual assault of a child conviction was affirmed, where the trial evidence was not closely balanced, the State did not commit prosecutorial misconduct, and the jury instruction on the mental state of "recklessness" was not error.

¶ 2     Defendant, Gonzalo Trevino Jr., appeals from a jury conviction of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1)) (West 2020)), for which he received a 12-year prison sentence. Defendant argues (1) the trial court committed plain error by violating Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (2) he was denied his right to a fair trial where the prosecutor argued facts not in evidence, and (3) the court incorrectly instructed the jury on the mental state for the offense. We affirm.

¶ 3                       I. BACKGROUND

¶ 4        On July 31, 2020, the State charged defendant by information with one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)). Before trial, the State amended the counts and elected to *nolle prosequi* the aggravated criminal sexual abuse charge. As amended, the State alleged that defendant committed the offense of predatory criminal sexual assault of a child

> "on or about January, 2020, *** in that said defendant, who was 17 years of age or older, committed an act of contact, however slight, between the sex organ of [A.M.], a person under 13 years of age, and the hand or finger of the defendant, for the purpose of sexual gratification or arousal of the victim or the defendant."

¶ 5        The matter proceeded to a jury trial on April 17, 2023. During *voir dire*, the trial court asked one panel of potential jurors, "Do you understand that the presumption of innocence remains with the Defendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved him beyond a—guilty beyond a reasonable doubt?" Each of these potential jurors responded, "Yes." The court did not ask any of these potential jurors whether they accepted this principle. One of the members of this panel was later selected as a juror without the court ever confirming that he accepted this principle.

¶ 6                          A. Jessica Cash

¶ 7        The State's first witness, Jessica Cash, was an expert in forensic interviewing of children. Cash testified that on February 26, 2020, she was employed by Shining Star Children's Advocacy Center (CAC) and conducted an interview of A.M. Based on her interview, Cash did not think A.M. showed any signs of being coached or of having rehearsed her statements ahead of time. A 40-minute video and audio recording of A.M.'s interview was published to the jury.

¶ 8                                B. Video Interview of A.M.

¶ 9            In the video, A.M. said that "Gonzo," a man whom her mother had watch her, touched her private parts. A.M. clarified that "Gonzo" was a nickname of defendant, her mother's ex-boyfriend. A.M. stated that she and her mother had slept over at defendant's house so that defendant could watch her when her mother went to work early in the morning. Sometime after her mother left for work, defendant went into A.M.'s room, woke her up, and told her to come lie down with him in his bed. Once in his bed, A.M. fell back asleep, but she woke up when defendant touched her private parts and it hurt. A.M. said that defendant touched her with his finger inside her clothes.

¶ 10           When asked if she said anything to him, A.M. said she was "scared to" and that she "kept on trying to roll over" and he just rolled her back over. At that point, Cash showed A.M. anatomical outlines of a boy and girl and asked A.M. to indicate what parts of her body and defendant's body had been involved. On the boy outline, A.M. pointed to the hand and fingers. On the girl outline, A.M. pointed to the vaginal area. A.M. also stated that defendant's fingers "didn't stay outside" her private, and she nodded in agreement when Cash asked, "So they went inside?" When defendant stopped touching her, A.M. pretended to wake up and went on like it was a normal day.

¶ 11           A.M. stated that the incident happened sometime in January 2020. In late February 2020, A.M. told her mother that she did not want to go to defendant's house anymore because he kept making her get in his bed. A.M.'s mother asked if anything else had happened and A.M. started to cry, then told her what happened. Her mother called the police and a doctor.

¶ 12                                C. Katrina Easley

¶ 13        Next, the State called Katrina Easley, a friend of A.M.'s mother. Easley met A.M.'s mother at work in late 2018 or early 2019 and met A.M. in the middle of 2019. A.M. lived with Easley from about March 2020 to May 2020, while A.M.'s mother was "having a little bit of a rough time" when "COVID had hit." On April 18, 2020, Easley and A.M. were in the kitchen washing dishes and joking around when A.M. "just kind of blurted" out the incident of sexual assault. A.M. stated that, after her mother went to work one morning, defendant told her to lie down with him. Defendant had inserted two fingers into A.M.'s vaginal area. Easley specifically remembered A.M. using the word "vagina."

¶ 14                                D. A.M.

¶ 15        A.M. identified defendant in court as "Gonzo," her mother's ex-boyfriend. A.M. stated that she had reviewed the recording of her interview at CAC before court that day and everything she said during the interview was the truth. A.M. also told Easley about what defendant did to her and that statement was the truth. Before the incident in this case, A.M. remembered telling her mother that defendant slapped her in the face and forced her to stay outside sometime in 2019.

¶ 16        On cross-examination, defense counsel questioned A.M. regarding the type of bedding in defendant's room and what A.M. was wearing during the incident. A.M. stated the bedding was either black or blue but then said she did not know the color. A.M. stated she was wearing a "pink unicorn nightgown." A.M. stated that during the CAC interview when she was 11 years old, she said she was wearing pants during the incident, and she called underwear "pants" at that time. She confirmed she did not mention the pink unicorn nightgown during the CAC interview. She stated that she told Easley defendant touched her and that he put two fingers inside her "private part."

¶ 17    Defense counsel asked A.M. if it was true that she told a friend of her mother's, named Kayla, that defendant slapped her because she did not want to be at defendant's house anymore. A.M. responded, "No, that is not correct. That is very incorrect." A.M. then stated that defendant slapped her at around 9 or 10 at night, but she did not remember the date. Defense counsel then asked if A.M. remembered when the slap allegedly occurred, and A.M. stated she was "not sure" because she has a "very bad memory" that is "like, a medical condition stating that I do." Defense counsel asked if there were any pictures of the injuries from the slap. A.M. responded:

> "A: Why would there be any injuries?
>
> Q: Well, [defendant's] a pretty big guy, isn't he?
>
> A: Yeah.
>
> Q: And you said he slapped you across the face, correct?
>
> A: Yeah.
>
> Q: And did it hurt?
>
> A: Yeah. I was 11 years old."

A.M. then stated she liked to stay with defendant before the slap occurred. After the slap occurred, she did not like to be left with defendant and did not like that he made her do chores.

¶ 18    On redirect examination, the State questioned A.M. as follows:

> "Q. [A.M.], I know that there were a couple of times when [defendant's] Attorney *** was asking you questions and you said that you have a bad memory?
>
> A. Yes.
>
> Q. But as far as what happened in January, when [defendant] did what he did to you—

A. Yes. I remember that perfectly.

Q. Why do you remember that so perfectly?

A. I don't know. If you have, like, certain trauma, I guess, you either block it out completely or you can remember it perfectly."

¶ 19                                        E. Shane Miller

¶ 20        The State's final witness was Shane Miller, a retired detective from the Lee County Sheriff's Office. In February 2020, Miller was employed as a detective and was involved in this investigation. Miller and his partner met with defendant at his home on March 11, 2020. Defendant told Miller that he had dated A.M.'s mother since September 2018 and A.M. was her 11-year-old daughter. They lived together for about a year, until A.M. claimed that defendant slapped her and locked her out of the house because he made her do dishes. Defendant said that all of his children laid in his bed because they liked to sit and watch TV there. A.M. came into his bed one time alone because her mother left for work, and she wanted to watch a movie. A.M. picked out the movie and defendant fell asleep.

¶ 21        Defendant told Miller that if he initiated sex with A.M.'s mother, he would put his fingers inside her vagina while she was sleeping. Defendant said that "sometimes he thinks that he's had dreams of stuff that happened that he thought was just a dream, but [A.M.'s mother] said, no, that actually happened, and he just doesn't remember because he was in a daze in the morning." When Miller confronted defendant with A.M.'s disclosure of sexual assault, defendant was asked if he thought A.M. would lie about that, and defendant said no. When Miller asked if defendant could have inserted his fingers into A.M. thinking it was A.M.'s mother, defendant responded that "he didn't dream about it, but he wasn't sure if he could have done it in a daze or not." Miller testified about photos he took of defendant's bedroom. Without objection, four photos were

admitted into evidence and published to the jury. Miller said that the photos corroborated A.M.'s description of the room.

¶ 22   Miller arranged another interview with defendant on July 29, 2020. The interview took place at the Lee County Sheriff's Office, and Miller contemporaneously observed the interview from a closed-circuit video screen. The interview was conducted by John Stout with the Department of Homeland Security. Miller testified that, toward the end of the interview, defendant

"advised that one morning after [A.M.'s mother] went to work, he went and woke [A.M.] up, asked her if she wanted to lay in bed with him; he did so and put in a movie and fell asleep. After approximately two hours, he woke up, noticed that his finger was on the private parts of [A.M.], and he then woke up and freaked out."

¶ 23                    F. Audio Recording of Defendant's Interview

¶ 24   In the audio recording of the interview, which was played for the jury, defendant stated that he went into his room, put on a movie, passed out, and woke up with his hands in A.M.'s pants, both in the "crotch" area and on her privates. As soon as he woke up and "fully realized" that it was not his girlfriend, he stopped, started "freaking out," got up, and went to do the dishes. He did not touch A.M. on purpose. He said, "if it ever happens that I woke up like that it is usually with my girlfriend, that is only the one time that it happened with her." After doing the dishes, he went outside to smoke a cigarette and "couldn't think of how or any of it." He could not remember the date of this incident but said it was sometime between January and February.

¶ 25                              G. Kayla Boyenga

¶ 26   Defendant called one witness, Kayla Boyenga. Boyenga was defendant's fiancée at the time of the trial. Boyenga testified that she knew A.M.'s mother for about 20 years and they used to be close friends. In August 2019, A.M.'s mother called Boyenga at work and said that

A.M. told her that defendant had slapped her across the face. Boyenga went to defendant's house late at night to pick up A.M. When Boyenga arrived, A.M. was standing in the front yard. Boyenga told A.M., "Well, he didn't lock you outside." A.M. responded, "I just want to go home; I lied; I just don't want to be here; I just want you to take me back home."

¶ 27                                H. Closing Argument

¶ 28        The State began its closing argument by stating: "According to the Rape, Abuse and Incest National Network, one in nine girls under the age of 18 experience sexual abuse at the hands of an adult. In 93 percent of those cases, the perpetrator is a person known to the victim." Defense counsel objected that this was not in evidence. The trial court overruled the objection. The State continued, "In January 2020, [A.M.] became another statistic."

¶ 29                                I. Jury Instructions

¶ 30        After closing arguments, the parties and the trial court conferred about jury instructions. The parties disagreed about what mental state the State was required to prove for the offense of predatory criminal sexual assault of a child. The State argued that the jury should be given Illinois Pattern Jury Instruction, Criminal, No. 5.01 (approved December 8, 2011) (hereinafter IPI Criminal No. 5.01) on the mental state of "recklessness." Defendant argued that the jury should be given instructions defining either intent or knowledge. See Illinois Pattern Jury Instructions, Criminal, No. 5.01A (approved October 28, 2016) (hereinafter IPI Criminal No. 5.01A); Illinois Pattern Jury Instructions, Criminal, No. 5.01B (approved October 28, 2016) (hereinafter IPI Criminal No. 5.01B). The court decided that IPI Criminal No. 5.01 on the mental state of recklessness would be given over defendant's objection.

¶ 31        On April 18, 2023, following deliberations, the jury returned a guilty verdict. On May 17, 2023, defense counsel filed a motion for a new trial, alleging, *inter alia*, (1) the trial court

erred in instructing the jury with a mental state of recklessness rather than the mental state of intent or knowledge and (2) the State made prejudicial and inflammatory statements during closing argument. On June 6, 2023, the court denied the motion.

¶ 32 On June 6, 2023, the trial court sentenced defendant to 12 years in prison. Defendant filed a motion to reconsider the sentence, arguing that 12 years was excessive and that the court failed to consider relevant evidence in mitigation. The court denied the motion the same day.

¶ 33 This appeal followed.

¶ 34 II. ANALYSIS

¶ 35 On appeal, defendant requests reversal of his conviction for predatory criminal sexual assault of a child and remand for a new trial. Defendant argues that (1) the trial court committed plain error by violating Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (2) he was denied his right to a fair trial where the prosecutor argued facts not in evidence, and (3) the court incorrectly instructed the jury on the mental state for the offense of predatory criminal sexual assault of a child.

¶ 36 A. Inadequate Rule 431(b) Inquiry

¶ 37 Defendant argues that the trial court's inquiry of one panel of potential jurors, from which one juror was selected, failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Specifically, defendant asserts that the court did not ask the members of that panel whether they accepted the principle that before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt, as required by Rule 431(b)(2). The court only asked whether the members of this panel understood this principle. Defendant acknowledges that he did not preserve this issue for appeal, but he argues for relief under the first prong of the

plain-error doctrine since the evidence at trial was closely balanced. The State responds that the evidence was not closely balanced.

¶ 38    Defendant forfeited this issue since he did not contemporaneously object to the trial court's failure to comply with Rule 431(b) or include the issue in a posttrial motion. *People v. Belknap*, 2014 IL 117094, ¶ 47. However, a defendant may nevertheless obtain relief pursuant to the plain-error doctrine in either of two circumstances. Under the first prong, the defendant must show that a clear or obvious error occurred and that the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *Belknap*, 2014 IL 117094, ¶ 48. Alternatively, under the second prong, the defendant must show that a clear or obvious error occurred and that the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Belknap*, 2014 IL 117094, ¶ 48. A "clear" Rule 431(b) violation is cognizable under the first prong of the plain-error doctrine. *People v. Sebby*, 2017 IL 119445, ¶¶ 52, 72. Here, defendant invokes the first prong, arguing that the evidence was closely balanced. The first step is to consider whether error occurred. *People v. Wilmington*, 2013 IL 112938, ¶ 31.

¶ 39    Rule 431(b) provides, *inter alia*, that the "court shall ask each potential juror, individually or in a group, whether that juror understands and accepts" that the defendant is presumed innocent of the charges against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Thus, under Rule 431(b), the trial court must "ask potential jurors whether they understand and accept the enumerated principles, mandating 'a specific question and response process.' " *Wilmington*, 2013 IL 112938, ¶ 32 (quoting *People v. Thompson*, 238 Ill. 2d 598, 607 (2010)).

¶ 40    Here, the trial court committed a clear or obvious error in that it failed to comply with Rule 431(b). The record establishes that the court asked one panel of potential jurors, from

which one juror was selected, only whether they understood that the State must prove the defendant guilty beyond a reasonable doubt. The court did not ask the members of this panel whether they accepted this principle. Thus, the court never confirmed that one member of defendant's jury accepted that the State must prove defendant guilty beyond a reasonable doubt. The court's failure to ask a juror if he accepted a Rule 431(b) principle is "error in and of itself." *Wilmington*, 2013 IL 112938, ¶ 32.

¶ 41    Thus, we must consider whether the evidence was closely balanced, such that defendant's conviction must be reversed and remanded for a new trial. In determining whether the evidence is closely balanced, a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case. *Sebby*, 2017 IL 119445, ¶ 53. This requires assessment of the evidence of the elements of the charged offense, along with any evidence regarding the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53. Whether the evidence was closely balanced depends upon the quantum of evidence the State presented against the defendant. *People v. Moore*, 2020 IL App (1st) 182535, ¶ 22.

¶ 42    The evidence established that defendant placed his fingers inside of A.M.'s pants and on her "privates." Defendant admitted this in the law enforcement interview that was played for the jury. At the age of 11, A.M. detailed this incident in the CAC interview that was played for the jury. At trial, A.M. confirmed the truthfulness of her statements in the CAC interview. Easley corroborated A.M.'s disclosure of the assault. Miller testified about defendant's statement that he obtained sexual gratification by touching his girlfriend's vagina while she was asleep and he was unaware until he found out the following morning, when he was in a "daze."

¶ 43    Defendant attempted to discredit A.M. by questioning her truthfulness about an unrelated incident in the year prior to the sexual assault allegations, where defendant slapped her.

A.M. testified that she remembered the sexual assault "perfectly" because it traumatized her. Defendant also questioned A.M.'s recollection of details of the bedding in the room where the assault took place. The photos in the record show bedding that is either blue or black, or possibly a mixture of both, which is consistent with what A.M. described.

¶ 44    Defendant's only witness was Boyenga, his fiancée, who testified that A.M. lied about being slapped by defendant in an unrelated incident the year before the sexual assault. Boyenga's testimony did not create a credibility contest related to the assault, as she did not testify about that assault. In any event, the jury was free to resolve any disputes relating to A.M.'s credibility in her favor. See *People v. Boling*, 2014 IL App (4th) 120634, ¶ 121 (noting that questions of credibility are to be resolved by the trier of fact). This testimony did not render this a closely balanced case where defendant admitted touching A.M.'s vagina.

¶ 45    We conclude that the evidence of defendant's predatory criminal sexual assault of A.M. was not closely balanced. Accordingly, we hold that defendant is not entitled to relief under the first prong of the plain-error doctrine.

¶ 46    B. Prosecutorial Misconduct

¶ 47    Defendant argues that he was denied a fair trial where the prosecutor committed misconduct by arguing facts not in evidence during closing argument, thereby unfairly prejudicing the jury. Specifically, defendant focuses on the statements about A.M. being another statistic of sexual abuse at the hands of an adult known to her.

¶ 48    Defendant argues the prosecutor's statements were improper and unfairly prejudiced the jury against him since they argued facts not in evidence for no other purpose than to inflame the passions of the jury. The State responds that (1) defendant forfeited this argument,

- 12 -

(2) any error was harmless when considered in light of the overwhelming evidence of defendant's guilt, and (3) any error was cured by the jury instructions.

¶ 49        Defendant preserved the issue for review by both objecting during trial and including the error in a posttrial motion. While defendant's trial objection referred to the statements not being in evidence and the posttrial motion referred to the statements inflaming the passions of the jury, it is clear that both objections related to the State's statements about sexual abuse statistics. Thus, the trial court had the opportunity to rule on the same arguments that defendant presents on appeal. Moreover, the Illinois Supreme Court has held that a party may forfeit a claim, but not an argument in support of a claim. *Brunton v. Kruger*, 2015 IL 117663, ¶ 76.

¶ 50        The State's statistics comment exceeded the bounds of proper argument since it was not based on evidence. This improper argument is reviewed *de novo* and requires reversal only if the jury could have reached the opposite verdict if the improper remarks were not made. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 23. In other words, the court must " 'determine whether the improper comment was so prejudicial that real justice was denied or the verdict resulted from the error.' " *People v. Williams*, 2022 IL 126918, ¶ 41.

¶ 51        Defendant cites to *People v. Wheeler,* 226 Ill. 2d 92, 131 (2007), where the evidence relied heavily on the credibility of law enforcement witnesses and the State's closing argument was riddled with statements that invoked an "us-versus-them" mentality that could make jurors feel compelled to side with the State to ensure their own safety. Here, we have one improper statement from the State versus a persistent pattern of misconduct. We find *Wheeler* distinguishable from this case.

¶ 52        Instead, we find *People v. Dat Tan Ngo*, 388 Ill. App. 3d 1048 (2008), instructive. In *Dat Tan Ngo*, this court considered the State's reference to statistics in a conviction for intent

to deliver at least 1500 tablets containing methylenedioxymethamphetamine (MDMA). *Dat Tan Ngo*, 388 Ill. App. 3d at 1050. In *Dat Tan Ngo*, a forensic scientist with the Illinois State Police testified that he randomly tested a small selection of 10 tablets from four bags to reveal the presence of MDMA. *Dat Tan Ngo*, 388 Ill. App. 3d at 1051. Not every tablet was tested. *Dat Tan Ngo*, 388 Ill. App. 3d at 1051. During closing argument, the State spoke at length about how identical the pills were, referencing statistics about random sampling and the likelihood of such samples representing the illegal substances in all of the pills. *Dat Tan Ngo*, 388 Ill. App. 3d at 1055-57. After providing a series of statistics, the State said, "That is all MDMA." *Dat Tan Ngo*, 388 Ill. App. 3d at 1056. This court found that the State's "attempted calculations sought only to demonstrate the long odds that the remaining tablets, which were similar in appearance, did not contain [MDMA]." *Dat Tan Ngo*, 388 Ill. App. 3d at 1057. This court found that while the State should avoid references to statistics not in the record in its closing argument, the defendant was not prejudiced considering the nature of the evidence against him. *Dat Tan Ngo*, 388 Ill. App. 3d at 1057.

¶ 53    Here, despite the State's improper comment during closing argument, the evidence of defendant's guilt was overwhelming. As described above, the evidence included (1) defendant's admission to the assault that was played for the jury, (2) A.M.'s CAC interview at 11 years old that was played for the jury, (3) A.M.'s testimony about the truthfulness of her statements, (4) Easley's corroborating testimony with respect to A.M.'s complaint, and (5) Miller's testimony about defendant's disclosed mode of obtaining sexual gratification. Accordingly, in light of the overwhelming evidence of defendant's guilt, we conclude that the erroneous comments here were not so prejudicial that real justice was denied or the verdict resulted from the error.

¶ 54    C. Error in the Instruction for the Mental State of Recklessness

¶ 55 Defendant argues that the trial court erred in instructing the jury on the mental state of "recklessness" rather than "intent" or "knowledge" for the offense of predatory criminal sexual assault of a child. The State responds that the court did not err in instructing the jury on the mental state. Defense counsel preserved this error for review by objecting during the jury instruction conference and including it in the posttrial motion. *Sebby*, 2017 IL 119445, ¶ 48.

¶ 56 The parties agree that the Criminal Code of 2012 addresses mental states under the principles of criminal liability. "If the statute does not prescribe a particular mental state applicable to an element of an offense *** any mental state defined in Sections 4-4, 4-5 or 4-6 is applicable." 720 ILCS 5/4-3(b) (West 2020). These three mental states are intent, knowledge, and recklessness. 720 ILCS 5/4-3(b) (West 2020); 720 ILCS 5/4-4, 4-5, 4-6 (West 2020).

¶ 57 During the jury instruction conference, the State argued that it should be allowed to instruct the jury on the mental state of "recklessness" because the predatory criminal sexual assault of a child statute did not specify a mental state, meaning any of the three mental states could apply. The State referenced the committee note on the "Definition of Predatory Criminal Sexual Assault of a Child" found in Illinois Pattern Jury Instructions, Criminal, No. 11.103 (approved April 29, 2016) (hereinafter IPI Criminal No. 11.103), which discussed *People v. Terrell*, 132 Ill. 2d 178, 210 (1989), in which our supreme court held, *inter alia*, that in the legislature's silence a mental state of knowledge, intent, or recklessness will be implied in the offense. See also *People v. Simms*, 192 Ill. 2d 348, 375 (2000) (interpreting *Terrell* to hold that a mental state of intent, knowledge, or recklessness must be implied to the offense of aggravated criminal sexual assault since that statute did not prescribe a mental state). This committee note goes on to state, "In accordance with [*People v. Anderson*, 148 Ill. 2d 15 (1992)], the Committee

- 15 -

has decided to provide three alternative mental states pursuant to Section 4-3(b) because Section 11-1.40(a) does not include a mental state." IPI Criminal No. 11.103.

¶ 58        In response, defendant argued that the State should have to prove the higher mental state of either "intent" or "knowledge." Defendant referenced *People v. Milka*, 336 Ill. App. 3d 206 (2003), *aff'd*, 211 Ill. 2d 150 (2004), to argue for the proposition that a mental state of either intent or knowledge is implicitly required for an act of sexual penetration. We note that *Milka* is based on a 1996 version of the predatory criminal sexual assault of a child statute where penetration was the only possible voluntary act element. *Milka*, 336 Ill. App. 3d at 223. In addition, *Milka*'s holding on the mental state instruction is that a jury need not be instructed on the implied mental states of intent or knowledge. *Milka*, 336 Ill. App. 3d at 234-235. In *Milka*, the court was deciding the issue of whether a jury instruction was defective for failing to "include the mental state required to commit predatory criminal sexual assault of a child." *Milka*, 336 Ill. App. 3d at 234. The *Milka* court was not presented with the legal issue before us of whether a mental state of recklessness could apply to the offense of predatory criminal sexual assault of a child. Moreover, the court in *Milka*, while relying on *Terrell*, overlooked language in *Simms*, 192 Ill. 2d at 375 (2000), where our supreme court explicitly interpreted *Terrell* to apply a mental state of intent, knowledge, or *recklessness* to the aggravated criminal sexual assault statute, which did not prescribe a mental state applicable to the offense.

¶ 59        The trial court here ultimately instructed the jury on a mental state of "recklessness." When an appropriate IPI instruction exists, it should be used unless the trial court determines that the instruction's recitation of the law is inaccurate. *People v. Pollock*, 202 Ill. 2d 189, 212 (2002); *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 97. Although pattern jury instructions are not themselves law and are open to challenge if they are inaccurate statements of

the law, the instructions are mandatory, if applicable and accurate. *People v. Polk*, 407 Ill. App. 3d 80, 108 (2010). "While we generally review for an abuse of discretion a trial court's decision to give a particular instruction, we review *de novo* the question of whether the jury instructions accurately conveyed the applicable law to the jury." *People v. Woods*, 2023 IL 127794, ¶ 55.

¶ 60    In *People v. Childs*, 407 Ill. App. 3d 1123, 1131 (2011), this court found that because the offense of aggravated criminal sexual assault does not prescribe a mental state, the mental state of intent, knowledge, or recklessness must be implied. The crime of aggravated criminal sexual assault requires, in relevant part, proof of " 'sexual penetration by the use of force or threat of force.' " *Childs*, 407 Ill. App. 3d at 1131 (quoting 720 ILCS 5/12–13(a)(1) (West 2008)). Even though aggravated criminal sexual assault has voluntary act elements of the use of force or threat of force, this court held that any of the three mental states are implied, citing *People v. Anderson*, 325 Ill. App. 3d 624, 633 (2001), which relied on section 4-3 of the Criminal Code of 1961 (720 ILCS 5/4-3 (West 2000)), which became effective on January 1, 1962, and has not been amended since. *Childs*, 407 Ill. App. 3d at 1131. As discussed in *Childs*, recklessness was an appropriate *mens rea* for the crime of aggravated criminal sexual assault, which involved elements of sexual penetration and the use of force or threat of force. This flies in the face of defendant's argument to this court that a reckless mental state is an "absurd" interpretation for the statute describing the crime of predatory criminal sexual assault of a child, which we note is an offense which has similar elements to aggravated criminal sexual assault.

¶ 61    Defendant further argues that failure to apply an intent or knowledge *mens rea* would result in punishing innocent conduct. This argument is unpersuasive. See *People v. Anderson*, 2024 IL App (5th) 220774-U, ¶ 19 (rejecting an argument that the predatory criminal

sexual assault of a child statute, which allows for a *mens rea* of recklessness, punishes innocent conduct).

¶ 62  The mental state of recklessness for predatory criminal sexual assault of a child is supported by *Simms* and *Terrell*, Illinois statutes providing for the use of any of the three mental states of intent, knowledge, or recklessness when a statute does not prescribe a particular mental state applicable to an element of an offense, Illinois Pattern Jury Instruction 11.103, and the Committee notes accompanying this pattern instruction. See *Simms*, 192 Ill. 2d at 375; *Terrell*, 132 Ill. 2d at 210; 720 ILCS 5/4-3(b) (West 2020), 720 ILCS 5/4-4, 4-5, 4-6 (West 2020); IPI Criminal No. 11.103. Thus, the jury instruction given in this case for predatory criminal sexual assault of a child appropriately conveyed recklessness as an applicable culpable mental state under the law. Accordingly, defendant is not entitled to relief on this issue.

¶ 63         III. CONCLUSION

¶ 64  For the reasons stated, we affirm the trial court's judgment.

¶ 65  Affirmed.