NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 170868-U

NO. 4-17-0868

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 21, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| JAMES E. WARREN, | ) | No. 17CF519 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Steigmann and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding (1) defendant failed to establish prejudice to support his claim of ineffective assistance of counsel, (2) the trial court's admonishments to the jury did not violate Rule 431(b), and (3) defendant failed to show his sentences resulted from an abuse of the trial court's discretion.

¶ 2    Defendant, James E. Warren, appeals from his convictions and sentences for domestic battery and unlawful restraint. On appeal, defendant argues this court should vacate his convictions and sentences and remand for a new trial because his trial counsel provided ineffective assistance as it related to the introduction of certain portions of an audio and video recording or, alternatively, because plain error occurred where the trial court's admonishments to the jury violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and the evidence was so closely balanced the error threatened to tip the scales of justice against him. In the alternative, defendant

argues this court should reduce his total sentence to 8 years in prison or remand for a new sentencing hearing because the sentences imposed against him are excessive. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4                                     A. Information

¶ 5            In April 2017, the State charged defendant by information with one count of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) (count I) and one count of unlawful restraint (720 ILCS 5/10-3(a) (West 2016)) (count II). Count I alleged defendant "knowingly caused bodily harm to Joy Cox, a family or household member of the defendant, in that the said defendant struck and kicked Joy Cox." Count II alleged defendant "knowingly and without legal authority detained Joy Cox, in that the said defendant refused to allow Joy Cox to leave a bedroom."

¶ 6                                     B. Jury Trial

¶ 7            In July 2017, the trial court held a two-day jury trial. Prior to commencing the trial, the court addressed a motion filed by the State to present evidence of defendant's commission of other instances of domestic violence pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2016)). Defendant objected on the ground the State's motion was untimely. The court agreed and sustained defendant's objection. The court also addressed a motion filed by the State to present evidence of defendant's prior convictions for purposes of impeachment. The court ruled, in part, it would not allow the State to use evidence of a recent domestic battery conviction. After addressing the State's motions, defense counsel noted an audio and video recording taken from a police body camera contained a statement from Cox wherein she suggests defendant had committed other instances of domestic violence. In response, the court

stated, "That will be excluded obviously."

¶ 8        During *voir dire*, the trial court explained to the venire the four principles contained in Rule 431(b): (1) defendant was presumed innocent of the charges against him, (2) the State had the burden of proving defendant guilty beyond a reasonable doubt, (3) defendant was not required to prove his innocence, and (4) defendant had an absolute right not to testify and any decision not to testify must not be considered in any way in arriving at a verdict. The court then impaneled prospective jurors in panels of four for examination. Prior to swearing the selected jurors in, the court stated to each panel,

> "[T]he four of you understand that the defendant is presumed to be innocent of the charges against him, that before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt, that the defendant is not required to offer any evidence on his own behalf, and that if the defendant does not testify, that fact cannot be held against him in any way. The four of you understand those instructions; is that correct?"

The record indicates the jurors answered in the affirmative. The court then asked each panel, "And the four of you will follow those instructions; is that correct?" The jurors again responded in the affirmative.

¶ 9        Following opening statements, the State presented testimony, multiple photographs, and an audio and video recording taken from a police body camera. Defendant did not present any testimony or evidence.

¶ 10        Joy Cox testified she could not remember the address where she resided or the

names of the individuals who she resided with three months earlier. Cox asserted she could not remember because she had a "major surgery" a week prior and was "under a lot of medication." Cox testified she also did not remember speaking with a police officer on April 22, 2017. Cox acknowledged she had known defendant for "[a] couple years." Cox testified she had not been in a dating relationship with defendant, but she had "went out with him a couple times."

¶ 11 Cox identified a photograph depicting herself and what appeared to be a house similar in appearance to the one where she resided in April 2017. Cox acknowledged she appeared to have blood on her face and purple-gray bruising around her left eye in the photograph. Cox testified she did not recall how she sustained the injuries. Cox was shown additional photographs but asserted she was having trouble identifying what the photographs depicted because she did not have her glasses.

¶ 12 On cross-examination, Cox testified defendant did not touch her, kick her, or pull her hair on April 22, 2017, and she did not remember reporting to the police that defendant had committed such acts. Cox acknowledged she had a conviction from a Champaign County case for "felony driving under revocation" and was still on probation.

¶ 13 David Nash testified he was living at 310 South Dodson Drive, Urbana, on April 22, 2017, along with defendant, who he had known for "a very long time," and Cox, who he had known for just a few months. Nash described defendant and Cox as "going together, a couple."

¶ 14 Nash testified he returned to the residence around 8 p.m. on April 21, 2017, at which time both defendant and Cox were present. Nash briefly spoke with defendant and Cox. He did not observe Cox to have any injuries. At about 10:30 p.m., Nash went to bed.

¶ 15 Around midnight, Nash heard yelling and screaming and the noise of "stuff flipping

over, like a little chest, dresser or something, stuff like that." At first the commotion came from defendant's and Cox's bedroom. It then came from the hallway, which caused Nash to open his bedroom door. Upon opening the door, Nash observed Cox "on the floor balled up, and James was standing over her." Nash then observed defendant hit Cox once in the rib area with a closed fist. Nash told defendant, " 'Come on, man.' *** 'It's not even worth it.' *** 'Going to jail over stupid stuff.' " Defendant looked at Nash and then backed up. At that point, Nash thought "it was over," so he closed his bedroom door and went back to bed.

¶ 16        Approximately 5 to 10 minutes after Nash closed his bedroom door, Cox abruptly entered Nash's bedroom and asked for help and to call the police. Cox jumped on Nash's bed and tried to get out a window, but it was locked. At that point defendant "[g]rabbed her by the ankles and snatched her off the bed." Cox landed on the floor, and then defendant dragged her back to their bedroom. Nash continued to hear "yelling and stuff" but, after a while, everything calmed down and he fell asleep. Later that morning, Nash was awoken by a police officer asking him questions. Nash spoke with the officer and reported defendant had "beat her up, I guess."

¶ 17        Nash acknowledged he had a felony conviction for aggravated domestic battery.

¶ 18        On cross-examination, Nash testified he reported to a police officer on the morning of April 22, 2017, defendant "beat the hell out of her." Nash asserted he did not tell the officer he did not see defendant hit Cox, nor did he tell the officer he returned to the residence around 2 or 3 a.m. on April 22, 2017. Nash testified he was not under the influence of alcohol or drugs on April 22, 2017. Nash testified his domestic-battery conviction was for "punching somebody." When asked if he was the person that battered Cox, Nash testified he was not.

¶ 19        Deputy Chelsey Keyes testified she and two other officers responded to a residence

located at 310 South Dodson Drive around 6 a.m. on April 22, 2017, based on a reported 911 hang-up call. Upon their arrival, Cox answered the front door to the residence. Deputy Keyes testified Cox appeared to be frightened and had dried blood covering her face, especially around her nose and mouth. Cox reported she had been beaten and needed an ambulance. Deputy Keyes called for an ambulance and then asked Cox who beat her and where that person was located. Cox reported it was her boyfriend and he was still in the residence.

¶ 20        Deputy Keyes and the other officers entered the residence and made contact with Cox's boyfriend, defendant. While walking through the residence, Deputy Keyes observed a trail of blood going from the living room through a hallway and into the bedroom where defendant was located. The bed located in the bedroom also had on it a large amount of blood.

¶ 21        Deputy Keyes spoke with Cox outside defendant's presence. Cox repeatedly stated, " 'He beat me.' " Deputy Keyes asked Cox to be more specific, and Cox stated she was in too much pain to remember the specifics but that it occurred over the course of the night and included defendant punching her in the face, kicking her in the ribs, dragging her across the floor, throwing her against a wall, pulling her hair, and picking her up by her belt loops. Cox also stated defendant would not let her out of the bedroom and she was only able to escape and call the police because defendant fell asleep. Cox reported the beating occurred five to six hours before the police arrived.

¶ 22        Once an ambulance arrived, Deputy Keyes escorted Cox to the ambulance. Once inside the ambulance, Cox removed some of her clothing. Deputy Keyes observed bruising to Cox's arms, legs, and back. She also observed scratches on Cox's chest and neck. Deputy Keyes took multiple photographs of the injuries apparent on Cox's body, which were admitted into evidence over no objection and published to the jury. The photographs depict Cox with dried blood

on her nose and mouth, a scratch and bruising on her neck, bruising on her left arm, a scratch on her left hand, bruising on her right arm, bruising on her chest, and bruising and swelling of her legs.

¶ 23　　　　　After Cox was taken by ambulance, defendant was placed under arrest. Deputy Keyes observed defendant's hands, which appeared to have "a fresh scrape on his right hand and some dried blood." Deputy Keyes took a photograph of defendant's hands, which was admitted into evidence over no objection and published to the jury. The photograph depicts a scratch to defendant's right hand and some dried blood on his right middle finger.

¶ 24　　　　　Deputy Keyes walked through the residence and took photographs of the blood throughout, which were admitted into evidence over no objection and published to the jury. The photographs depict a trail of blood going from the living room through a hallway and into a bedroom, with a large amount of blood on a bed inside the bedroom.

¶ 25　　　　　Deputy Keyes acknowledged another roommate, Nash, was present in the residence upon her arrival. She did not speak to Nash.

¶ 26　　　　　Deputy Keyes testified she was wearing an activated body camera during the morning of April 22, 2017. The State sought to admit an audio and video recording taken from Deputy Keyes's body camera and have it published to the jury. Defendant objected on the ground Cox indicated she "doesn't remember." The trial court overruled defendant's objection, and the recording was published to the jury.

¶ 27　　　　　The recording begins with Cox answering the front door of a residence. Her face appears bloodied, and she is leaning over holding the side of her body. Cox answers some questions at the door and then directs the officers to where defendant is located. Officers walk into a

bedroom, where they find defendant in bed. Drawers which appear to be from a dresser, along with some clothing, are scattered throughout the room. The officers begin to have a conversation with defendant. At some point, the trial court stopped the recording and held a conference outside the presence of the jury. During the conference, the court indicated the purpose of the recording was to show the statement Cox gave to Deputy Keyes. The court indicated what it had seen was the interaction between other officers and defendant. The court suggested the State have the video cued up in such a way to only show the conversation between Cox and Deputy Keyes.

¶ 28    The State resumed playing the recording. Deputy Keyes speaks with Cox in the living room. During the conversation, Cox reports defendant "snapped" and then "attacked" her and held her "hostage" for approximately five or six hours. During the attack, Cox reports defendant punched her in the head, punched her in the ribs, kicked her in the ribs, threw her against a wall, pulled her hair, picked her up by her belt loops, and dragged her throughout the residence. Cox reports at one point she ran to the room of her roommate, who she identified as David Nash, jumped on his bed, and told him to call 911. Defendant then dragged her back to the bedroom. Cox notes Deputy Keyes may be able to find blood on Nash's bed from when she went into his room. Cox reports defendant prevented her from calling the police and she was able to do so only after defendant fell asleep. Cox reported being in severe pain, specifically related to her face and ribs. Cox stated Nash, despite his failure to stop the attack or seek help, was "not at fault." Throughout her description of the attack and restraint she sustained, Cox made several statements about her history with defendant: (1) "He beats on me all the time. He's on probation for domestic battery against me. And I'm not smart enough to leave him."; (2) "He gets mad and he starts hitting me, and this is the worst he's ever done."; (3) "I always try to explain this to you guys. He is a woman

beater. He just snapped. And he beat me. He does this. This is his MO. You don't have to do anything to cause it."; and (4) "He just snaps. It doesn't have to be cause[d] by anything. You know and I went to jail last time."

¶ 29    At a later point in the recording, Deputy Keyes escorts Cox to an ambulance. While doing so, Deputy Keyes asks, "Is this the worst this has ever happened?" Cox responds she and defendant had been together not even a year and she "knew he was like this when I got with him." At another point, Deputy Keyes takes photographs of the injuries apparent on Cox's body. While doing so, Cox reports a mark on her chest was "from a couple nights ago." We note the record is not clear whether these later portions of the recording were published to the jury.

¶ 30    On cross-examination, Deputy Keyes testified she did not observe any abrasions to defendant's knuckles. Deputy Keyes acknowledged she did not inspect Nash's bedroom or his hands.

¶ 31    Deputy Robert Derouchie testified he and other officers responded to a residence located at 310 South Dodson Drive during the early morning hours of April 22, 2017. Upon their arrival, Cox answered the front door of the residence. Deputy Derouchie testified Cox appeared to be nervous and had dried blood on her nose and mouth and bruising to her left eye.

¶ 32    Deputy Derouchie and the other officers entered the residence and made contact with defendant, who appeared to be sleeping in the master bedroom. Defendant stated he had returned to the residence two to three hours earlier and found Cox asleep in the bed. He then got in bed with her and went to sleep. Deputy Derouchie asked defendant about blood he observed in the hallway and the master bedroom, to which defendant stated he was unaware of the blood and had no idea where it came from. Deputy Derouchie described defendant as being calm for being

awoken by police and learning there was blood throughout his residence. Deputy Derouchie also observed the bedroom had some of the dresser drawers pulled out and clothing scattered throughout.

¶ 33　　　　Deputy Derouchie spoke with Nash, who was in an adjacent bedroom. Nash's bedroom had a window immediately behind a bed. Nash was cooperative. Deputy Derouchie did not observe any blood in Nash's bedroom or on his person.

¶ 34　　　　After speaking with everyone present in the residence, defendant was arrested. Deputy Derouchie observed defendant's hands, which appeared to have "a fairly fresh scratch" on his right index finger as well as "some dried blood."

¶ 35　　　　On cross-examination, Deputy Derouchie testified he did not specifically look for blood while in Nash's room or ask to see Nash's hands. Deputy Derouchie acknowledged he did not observe any abrasions to defendant's knuckles. With respect to his conversation with Nash on the morning of the incident, Deputy Derouchie acknowledged Nash reported (1) returning to the residence around 2 or 3 a.m. that morning as opposed to 8 p.m. the night before and (2) he only " 'heard something' " as opposed to observed anything. With respect to his conversation with defendant, Deputy Derouchie acknowledged defendant denied hitting Cox.

¶ 36　　　　In closing argument, the defense presented a theory suggesting Nash was the individual who caused Cox's injuries. In support, defense counsel noted Nash's conviction for domestic battery and the inconsistencies between his testimony and what he reported to Deputy Derouchie. Counsel also noted the audio and video recording showed Nash never leaving his room despite the commotion from several officers being in the residence. Counsel highlighted the lack of evidence concerning any investigation into Nash, including any photographs of Nash hands.

Counsel asserted Cox was a convicted felon who was trying to cover for her boyfriend, Nash—not defendant. With respect to defendant, counsel highlighted his cooperation, the fact he was asleep when the police arrived, and the fact he did not have any abrasions to his knuckles. As to the blood on defendant's hand, counsel suggested the blood may have been transferred when defendant got into bed to go to sleep.

¶ 37 The trial court instructed the jury, in part, (1) defendant was presumed innocent of the charges against him, (2) the State had the burden of proving defendant guilty beyond a reasonable doubt, (3) defendant was not required to prove his innocence, and (4) the fact defendant did not testify must not be considered by the jury.

¶ 38 Following deliberations, the jury found defendant guilty of both charged offenses.

¶ 39                                    C. Posttrial Proceedings

¶ 40 In August 2017, defendant filed a posttrial motion for acquittal or, in the alternative, a new trial. In part, defendant alleged the trial court erred in allowing the State to introduce the audio and video recording as Cox testified "she did not remember what happened."

¶ 41 At a hearing that same month, the trial court denied defendant's posttrial motion and then proceeded to sentencing. The court received a presentence investigation report (PSI).

¶ 42 According to the PSI, defendant, who was then 57 years old, had a lengthy criminal history dating back to 1980, which now included, among numerous convictions for misdemeanor and traffic offenses, convictions for 12 felony offenses. Defendant's felony convictions included convictions for aggravated battery and domestic battery. Defendant had received sentences of conditional discharge, probation, intensive probation, incarceration, and imprisonment. Many of defendant's community-based sentences were revoked. In January 2017, defendant was sentenced

to 12 months' probation for a domestic battery conviction that involved Cox as the victim.

¶ 43    Defendant reported he had been in a dating relationship with Cox, who was 52 years old, since 2015. For about five or six months, defendant lived with Cox at 310 South Dodson Drive and, prior to that time, he lived with Cox at another address for about a year. Defendant described his relationship with Cox as " 'great.' " Cox received a plenary order of protection against defendant on June 21, 2017.

¶ 44    Defendant was unemployed. He had been able to obtain and maintain employment in the past. Defendant did not possess a high school diploma or an equivalent.

¶ 45    Defendant reported his father was both physically and verbally abusive to him, his mother, and his siblings during his childhood. Defendant commented, " 'When I was little, life was miserable.' "

¶ 46    Defendant reported his " 'drug of choice' " was cocaine. He indicated his use of cocaine was " 'really out of control' " when he was younger, but his use had lessened over the past five years, consuming the drug about once or twice a week. Defendant stated his drug use was " 'always a struggle.' " Defendant admitted he used cocaine "on the night of his arrest for the present offense." Defendant reported he had previously used heroin " 'to come down from cocaine,' " but he had not done so since 2010. Defendant admitted he had committed crimes in the past to acquire drugs and his drug use was problematic.

¶ 47    Defendant believed the major problems in his life were " '[e]ducation, work, drugs.' " Defendant expressed a willingness to address these problems. When asked "how he felt about his present situation," defendant stated, " 'Really bad. That's how I was raised as a child, but in my heart I know it's not right.' "

¶ 48 The State recommended defendant be sentenced, generally, to eight years' imprisonment. In support of its recommendation, the State highlighted defendant's criminal history, including his convictions for violent offenses, the fact his most recent conviction involved the same victim, and his unsuccessful termination of community-based sentences. The State also highlighted the severity of Cox's injuries. The State suggested Cox's apparent desire not to testify demonstrated the cycle of abuse she had gone through with defendant. The State asserted its recommended sentence would serve as a deterrent to defendant and others similarly situated.

¶ 49 The defense recommended an unspecified sentence in the lower statutory range. In support of its recommendation, the defense highlighted defendant's childhood abuse, addiction, and age. The defense also highlighted defendant's alleged remorse, noting he indicated he felt " '[r]eally bad' " about the incident and knew " 'it's not right.' "

¶ 50 Following the party's recommendations, defendant gave a brief statement in allocution. Defendant requested "the mercy of the court."

¶ 51 In the oral pronouncement of its decisions, the trial court stated it considered the PSI, the comments of counsel, the comments of defendant, and the statutory factors in aggravation and mitigation.

¶ 52 In mitigation, the trial court found, "There aren't any statutory mitigating factors that apply to this defendant to this type of an offense." The court recognized "a non[-]statutory mitigating factor is obviously the age of the defendant." The court recognized defendant had been able to obtain and maintain employment in the past. The court recognized defendant was "an addict" based on what was reported in the presentence report.

¶ 53 In aggravation, the trial court found defendant's conduct caused serious harm—

"She's a frail, small woman and, on the date in question, this defendant beat the living daylights out of her, absolute violent rage on his part." The court also found defendant had a lengthy criminal history, which included a recent domestic battery conviction involving the same victim. Finally, the court found it needed to impose a sentence to deter defendant and others from committing the same crime. The court believed, until defendant understood his conduct would not be tolerated, he would continue "to repeat it over and over again, even at his age of 57 years."

¶ 54 The trial court sentenced defendant to an extended term of 10 years' imprisonment for domestic battery and 3 years' imprisonment for unlawful restraint. The sentences were imposed concurrently.

¶ 55 In September 2017, defendant filed a motion to reconsider, arguing his sentences were excessive in light of his childhood abuse, addiction, and age. Following a November 2017 hearing, the trial court denied defendant's motion.

¶ 56 This appeal followed.

¶ 57 II. ANALYSIS

¶ 58 On appeal, defendant argues this court should vacate his convictions and sentences and remand for a new trial because his trial counsel provided ineffective assistance by failing to object to the introduction of those portions of the audio and video recording containing statements about his prior bad acts, failing to request a limiting instruction, and failing to raise the issue in a posttrial motion or, alternatively, because plain error occurred where the trial court's admonishments to the jury violated Rule 431(b) and the evidence was so closely balanced that the error threatened to tip the scales of justice against him. In the alternative, defendant argues this

- 14 -

court should reduce his total sentence to eight years in prison or remand for a new sentencing hearing because the sentences imposed against him are excessive.

¶ 59                                    A. Assistance of Counsel

¶ 60            Defendant argues his trial counsel provided ineffective assistance by failing to object to the introduction of those portions of the audio and video recording containing statements about his prior bad acts, failing to request a limiting instruction, and failing to raise the issue in a posttrial motion. The State disagrees.

¶ 61            "The sixth amendment [(U.S. Const., amend. VI)] guarantees a criminal defendant the right to effective assistance of trial counsel at all critical stages of the criminal proceedings ***." *People v. Brown*, 2017 IL 121681, ¶ 25, 102 N.E.3d 205. Claims of ineffective assistance of counsel are governed by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246, 1255-56 (1984) (adopting *Strickland*). To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687; *Brown*, 2017 IL 121681, ¶ 25.

¶ 62            To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel's performance was "so inadequate 'that counsel was not functioning as the "counsel" guaranteed by the sixth amendment.' " *People v. Dupree*, 2018 IL 122307, ¶ 44, 124 N.E.3d 908 (quoting *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999)). To satisfy the prejudice prong of *Strickland*, the defendant must demonstrate "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

- 15 -

different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767 (quoting *Strickland*, 466 U.S. at 694). "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601. In those cases where a claim "can be disposed of because the defendant suffered no prejudice, we need not address whether counsel's performance was deficient." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 57.

¶ 63        Defendant fails to establish prejudice to support his claim of ineffective assistance of counsel. The evidence of defendant's guilt is overwhelming. In the audio and video recording, Cox provides a detailed explanation of the attack and restraint she suffered by the hands of defendant shortly after it occurred. Cox's account was corroborated by Nash's testimony about what he heard and observed, the deputies' testimony about what they heard and observed, and the photographs of defendant's hands and the blood throughout the residence. Even if counsel had objected and all the statements of defendant's prior bad acts were not presented to the jury, there is no reasonable probability that the result of the proceeding would have been different. Because defendant fails to establish prejudice, his ineffective-assistance-of-counsel claim fails.

¶ 64                                B. The Trial Court's Admonishments

¶ 65        Defendant argues plain error occurred where the trial court admonishments to the jury violated Rule 431(b) and the evidence was so closely balanced that the error threatened to tip the scales of justice against him. The State disagrees.

¶ 66        Defendant concedes he forfeited his contention of error by failing to raise it before the trial court but asserts his forfeiture may be excused under the plain error doctrine. The plain error doctrine provides a "narrow and limited exception" to the general rule of forfeiture. *People*

*v. Reese*, 2017 IL 120011, ¶ 72, 102 N.E.3d 126. Under the plain error doctrine, a reviewing court may disregard a defendant's forfeiture and consider an unpreserved claim of error in two circumstances:

> "(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.)
> *People v. Harvey*, 2018 IL 122325, ¶ 15, 115 N.E.3d 172.

The defendant bears the burden of persuasion in establishing plain error. *People v. Wilmington*, 2013 IL 112938, ¶ 43, 983 N.E.2d 1015.

¶ 67        We turn first to whether defendant has shown a clear or obvious error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19, 984 N.E.2d 475. Defendant asserts the trial court violated Rule 431(b) by asking the jurors if they would follow its instructions concerning the Rule 431(b) principles, rather than asking if the jurors accepted the legal principles. Defendant also asserts the court erred by commingling all four principles into one question. In considering whether the court committed a clear and obvious error with respect to its compliance with Rule 431(b), our review is *de novo*. *People v. Belknap*, 2014 IL 117094, ¶ 41, 23 N.E.3d 325.

¶ 68        Rule 431(b) requires a trial court to:

- 17 -

"ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

Rule 431(b) further states, "The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." *Id.*

¶ 69     We turn first to whether the trial court erred by asking about the four principles in compound form. In *People v. Willhite*, 399 Ill. App. 3d 1191, 927 N.E.2d 1265 (2010), this court considered whether the trial court, with the same trial court judge presiding in this case, violated Rule 431(b) when it used identical language to the language used in this case. This court held the trial court did not violate Rule 431(b) by asking the jurors if they understood the four principles in compound form. *Id.* at 1196-97. This court concluded the plain language of Rule 431(b) does not require separate questions of the jurors about each individual principle. *Id.* "Nor does the rule require separate, individual answers from each juror." *Id.* at 1197.

¶ 70     Defendant relies primarily on *People v. Thompson*, 238 Ill. 2d 598, 939 N.E.2d 403 (2010), in support of his argument. In *Thompson*, the supreme court found the trial court failed to comply with Rule 431(b), noting it entirely failed to address one of the four principles and did not ask the jurors if they both understood and accepted another principle. *Id.* at 607. The supreme court

- 18 -

pointed out that Rule 431(b) requires the trial court to "address each of the enumerated principles" and to determine whether the jurors understood and accepted each of the principles. *Id.* In so holding, the supreme court noted the committee comments to the rule "emphasize that trial courts may not simply give 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law.' " *Id.* (quoting Ill. S. Ct. R. 431(b), Committee Comments (eff. July 1, 2012)). The court further held the rule required a specific question and response process, but the questioning may be performed individually or in groups so long as there was an opportunity for a response from each juror. *Id.*

¶ 71    Nothing in *Thompson* requires the trial court to address each principle individually. Rather, *Thompson* was concerned with the court's failure to address one principle entirely and to determine the jurors' acceptance of another principle. Moreover, the plain language of Rule 431(b) contains no requirement that the court must recite each principle separately when determining the jurors' understanding and acceptance of the principles. We stand by our prior decision in *Willhite* and conclude the trial court did not err by asking about the four principles in compound form.

¶ 72    We turn next to whether the trial court erred by asking the jurors if they would "follow" its "instructions" concerning the Rule 431(b) principles, rather than asking the jurors if they "accepted" the "principles." In *Wilmington*, 2013 IL 112938, ¶ 30, the trial court did not ask the jurors if they understood and accepted the principle that they could not hold it against defendant if he did not testify. The trial court asked the jurors if anyone disagreed with the remaining three principles. *Id.* ¶ 28. The trial court also failed to ask the jurors if they understood the remaining three principles. *Id.* The supreme court concluded error clearly occurred, noting that "[w]hile it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror

- 19 -

*acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself. Moreover, the trial court did not even inquire regarding the jury's understanding and acceptance of the principle that defendant's failure to testify could not be held against him." (Emphases in original.) *Id.* ¶ 32.

¶ 73    In *Belknap*, 2014 IL 117094, ¶ 44, the trial court asked only whether the jurors disagreed with, had any quarrel with, or accepted the four principles. The court failed to ask if the jurors understood the principles. The supreme court again found error, stating as follows:

> "Here, the trial court did not explicitly ask the potential jurors whether they accepted the principles; rather the court asked if they had any disagreement or quarrel with the principles. As we noted in *Wilmington*, it may be arguable that asking jurors whether they disagreed with the Rule 431(b) principles is tantamount to asking them whether they accepted those principles. However, the trial court's failure to ask whether the jurors understood the principles constitutes error alone." *Id.* ¶ 46.

¶ 74    Here, the trial court asked the jurors whether they would follow its instructions concerning the Rule 431(b) principles. Asking whether the jurors would follow its instructions concerning the Rule 431(b) principles is far closer to asking if the jurors accepted the principles than asking if they disagreed with the principles. Black's Law Dictionary defines the verb "follow" as "[t]o conform to or comply with; to *accept* as authority." (Emphasis added.) Black's Law Dictionary 672 (8th ed. 2004). We find the court satisfied Rule 431(b) by asking the jurors if they would follow its instructions concerning the Rule 431(b) principles. Indeed, this court has

previously assumed the language was sufficient to comply with the requirement that jurors be asked if they accepted the principles. See *Willhite*, 399 Ill. App. 3d at 1197 (concluding the trial court complied with Rule 431(b) when it asked jurors if they understood and would follow its instructions concerning the Rule 431(b) principles); accord *People v. Staple*, 402 Ill. App. 3d 1098, 1108, 932 N.E.2d 1064, 1073 (2010). We conclude no error occurred here.

¶ 75 Although we find no error, we believe it better practice for the court to inquire of the jurors rather than instruct them. By asking whether they understand and accept the principles, as opposed to stating so in an affirmative manner and then eliciting a response with a leading question, the court's question would seem less suggestive and more properly inquisitive. Such an inquiry ensures each juror receives an opportunity to respond to specific questions concerning the principles set forth in Rule 431(b).

¶ 76                                    C. Sentences Imposed

¶ 77 Defendant argues the sentences imposed against him are excessive as the trial court failed to consider mitigating evidence and imposed a total sentence of imprisonment above the State's recommendation. The State disagrees.

¶ 78 Defendant does not dispute his sentences falls within the applicable statutory limits. A sentence that falls within the applicable statutory limits is generally reviewed for an abuse of discretion. *People v. Price*, 2011 IL App (4th) 100311, ¶ 36, 958 N.E.2d 341. This is because a trial court is generally "in a better position than a court of review to determine an appropriate sentence based upon the particular facts and circumstances of each individual case." *Id.* (Internal quotation marks omitted.) A sentence imposed within the statutory limits "will not be deemed

excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Id.*

¶ 79 Defendant initially contends the trial court failed to consider the evidence of his childhood abuse, addiction, and age as mitigating. We disagree. A "trial court is presumed to have considered the mitigating evidence contained in the record." *People v. Means*, 2017 IL App (1st) 142613, ¶ 16, 74 N.E.3d 43. The PSI detailed, and defense counsel highlighted, defendant's childhood abuse, addiction, and age. In the oral pronouncement of its decisions, the trial court explicitly stated it considered the PSI and the comments of defense counsel. In fact, the court addressed defendant's addiction and age on the record. Defendant then again brought to the court's attention his childhood abuse, addiction, and age in his motion to reconsider his sentence. Based on this record, defendant has failed to show the trial court did not consider the evidence of his childhood abuse, addiction, and age as mitigating.

¶ 80 Ultimately, the trial court found lengthy terms of imprisonment were necessary based on the nature and circumstances of the offenses, defendant's criminal history, and the need for deterrence. Based on the evidence before it, we cannot say the trial court abused its discretion in rendering its sentencing decisions, even where the total sentence of imprisonment was above the State's recommendation. See *id.* ("[A] court is not bound by the prosecution's sentencing recommendation.").

¶ 81 III. CONCLUSION

¶ 82 We affirm the trial court's judgment.

¶ 83 Affirmed.

- 22 -