2021 IL App (1st) 180556-U

No. 1-18-0556

Order filed May 21, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 4574 |
| | ) | |
| MICHAEL CARAWAY, | ) | Honorable |
| | ) | Tommy Brewer, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for attempt murder and aggravated battery are affirmed. The court's failure to question a juror regarding the principles of Illinois Supreme Court Rule 431(b) does not rise to plain error. The court did not fail to conduct an adequate *Krankel* inquiry where defendant's claims of ineffective assistance were meritless on their face. The defendant's sentence is vacated, and the matter is remanded for resentencing, including for a determination as to whether the defendant inflicted severe bodily injury mandating the imposition of consecutive sentences.

¶ 2    Following a jury trial, the defendant, Michael Caraway, was convicted of attempt first degree murder (720 ILCS 5/9-1(a)(1) (West 2016); 720 ILCS 5/8-4(a) (West 2016)) and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)), and sentenced to consecutive, respective terms of 37 and 7 years' imprisonment. On appeal, the defendant argues he was denied his right to a fair trial where the trial court failed to ask one of the jurors whether he understood and accepted the principles set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). He also argues his case should be remanded because the trial court failed to conduct a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) into his posttrial claim of ineffective assistance of trial counsel. Lastly, he argues that this case should be remanded for resentencing due to the subsequent reversal of his convictions in an unrelates case which the trial court relied upon in fixing his sentence in the instant matter and also for the trial court's determination of whether he inflicted severe bodily injury so as to require consecutive sentences. We affirm in part, vacate in part, and remand for a new sentencing hearing.

¶ 3    After a February 20, 2017 shooting, the defendant was charged with six counts each of attempt first degree murder of Claude Hawthorne, Darryl Williams, and Juane Taylor, one count each of aggravated battery of Claude, Darryl, and Juane, and one count each of aggravated discharge of a firearm in the direction of Claude, Darryl, and Juane.[1] The State proceeded to trial on two counts of attempt first degree murder of Claude, two counts of attempt first degree murder of Darryl, one count of aggravated battery of Darryl, and one count of aggravated battery of Claude.

---

[1] Because multiple witnesses share the same last names, we will refer to the lay witnesses by their first names.

¶ 4     During *voir dire*, the trial court informed the prospective jurors, in pertinent part, that (1) a defendant is presumed innocent until a jury determines that the person is guilty beyond a reasonable doubt; (2) the State has the burden of proving the defendant guilty beyond a reasonable doubt; (3) a defendant does not have to present any evidence at all and may rely on the presumption of innocence; and (4) a defendant does not have to testify. For each of the first three statements, the court asked the group "[d]oes anyone disagree with this rule of law?" For the last statement, the court asked the group "[w]ould any of you hold the fact that a defendant did not testify at trial against that person?" The court noted for the record that there were no hands showing in response to the questions. After asking further questions to the group, the trial court commenced questioning the prospective jurors individually. The court asked each individual whether he or she understood and accepted each of the principles enumerated during group questioning. However, the court did not ask that question of one juror, J.Z., who was subsequently chosen to sit on the jury.

¶ 5     At trial, Darryl testified that, on February 20, 2017, he was near an address in the 600 block of Brookline Street in Chicago Heights. More than 10 people were at that location, including his close friends Juane, Claude and Claude's wife, Tamicca. When he arrived, he exited his car and approached Claude to shake his hand, when "heard shots." According to Darryl, he "got hit" in his arm by two bullets and fell to the ground. He heard approximately 15 more shots, "probably more than that." He testified that he did not see the face of the person who shot him.

¶ 6     Darryl displayed where he had been shot in his right arm and explained that the first bullet hit his right tricep area and the second bullet struck underneath his right armpit. The first bullet shattered, and only one bullet exited his body. Fragments of the bullet remained in his arm at the time of trial. He had deformation in his right bicep area due to the gunshot which resulted in his

"whole bone shatter[ing]." At the time of trial, he was still under the care of a physician and planned on having surgery on that arm. Darryl identified photographs of himself at the hospital, which showed a white bandage over the injury to his right arm. The State published the photographs to the jury.

¶ 7     Darryl denied being armed on the date he was shot. He testified that he did not know who shot him. According to Darryl, when he was on the ground, he saw two individuals wearing all black clothing shooting from 25 feet away, but he could not see their faces because the street lighting was very poor in the area. He stated that he was familiar with the defendant, whom he knew as "MC," and had known him "half [his] life." Darryl denied seeing the defendant anywhere near the address where the shooting occurred.

¶ 8     Darryl admitted that, when he went to the Chicago Heights police department on February 22, 2017, to retrieve his property, he was interviewed by Chicago Heights Detective Henderson and an assistant state's attorney (ASA) about the shooting. Darryl denied answering their questions truthfully and stated that he "just wanted [his property]." He testified that he "didn't lie" during the interview, but rather said "what people wanted" him to say and what he was told happened. He did not know whether he had a second video-recorded interview with Henderson and the ASA. He did not remember saying that he saw "MC" walking toward him before the shooting and denied knowing or remembering whether he stated that the defendant was standing "close," approximately 20 feet away, "on the grass part." He did not remember stating that the defendant pointed a gun at him, demonstrating how defendant held the gun, or indicating how many shots the defendant fired. Darryl denied remembering anything of the interview, stating that he was "off Norco" at the time. He did not remember informing the investigators that he "[saw] MC's face clear as day" and stated

that he was never asked whether the defendant was the person who raised his gun. He denied telling the investigators that "[t]he man came on a mission." He acknowledged that he had felony convictions for possession of a controlled substance and armed robbery.

¶ 9    On cross-examination, Darryl stated that the shooting took approximately 10 seconds, during which time he was on the ground. He did not remember whether he spoke with an investigator at the hospital. He denied knowing who shot him and denied hearing anyone say who shot him. He explained that the reason he agreed to speak with the investigators at the police station was because they were holding his property. He repeated that he never saw the defendant shoot him, Claude, or Juane.

¶ 10    ASA Ben Williams testified that, on February 22, 2017, he interviewed Darryl with Detective Henderson present. According to ASA Williams, after this initial interview, he asked Darryl whether he was willing to give a video statement, and Darryl consented.

¶ 11    In the video, which was published to the jury, Darryl stated he went to the Brookline residence on February 20, between 8:00 and 9:00 p.m., where many people were standing outside. When he arrived, he saw "MC" coming toward him. He identified and signed a photograph of MC, whom he had known for approximately 20 years. Darryl stated that, as he was standing on the driveway, MC was walking toward him from across the street, coming within about 20 feet. MC, who was wearing a black hoody, pulled out a gun and fired "a lot" of shots. He stated that a man named Randall and another man who he did not know were also firing shots at the crowd. According to Darryl, he fell to the ground, and the men continued to shoot. He saw MC's face "clear as day;" "the man came on a mission." Darryl explained that there were street and porch lights with enough lighting that he could see faces. Darryl stated he had not been threatened nor

promised anything in exchange for giving the statement and that was speaking freely and voluntarily. He admitted that he was taking pain medicine, but denied that it affected his memory of the events.

¶ 12    On cross-examination, ASA Williams testified that he asked Darryl whether or not he was under any medication that would affect his ability to remember the incident. Darryl did not tell him that he had been taking Norco, which he knew to be a prescribed pain medication. Prior to the interview, Darryl said "I ain't saying anything until I get my s***." ASA Williams stated that the initial conversation with Darryl was voluntary, but that when he started the video, Darryl said he would not talk anymore until he received his "stuff" at which point Detective Henderson retrieved Darryl's belongings.

¶ 13    Claude testified that, on February 20, 2017, in the early afternoon, he was playing a video game with his cousins in Chicago Heights. Between 8:00 and 9:00 p.m., he went to his family's house on Brookline Street where "a lot of people," including his wife, Tamicca, and Darryl were "drinking [and] chilling." Claude stated that he stood on the sidewalk in front of the residence, and that Tamicca was "[s]omewhere by the driveway" on the same side of the street. According to Claude, as soon as the shooting began, he ran to the side of another house to take cover and lay down. It was then that he noticed that he had been shot in the chest. He sustained two shots to the chest—one by his lung and one by his heart; he was also shot in the arm. He stated that he did not know how many shots were fired.

¶ 14    Claude testified that he did not see the face of the person who shot him nor the gun that was used because "[i]t was dark." When the shots were fired, he turned and ran in a different

direction. According to Claude, he did not see the defendant at the Brookline Street address, but had seen him "ride past" his cousin's house, earlier in the afternoon.

¶ 15 Claude explained that, as a result of the shooting, he had one surgery on his arm and chest. He stated that his arm aches a little "when it get[s] cold." After he was shot, he went to the hospital with his wife and friend. On the way, the police arrived and transferred him to an ambulance. In the ambulance, he spoke with detectives who asked who shot him. According to Claude, he responded by "repeating what everybody in the car was telling [him]." He told the detectives that "MC" had shot him, "because that's what they said." Claude identified the defendant in court as MC. He also identified photographs of himself at the hospital and of his injuries, which he testified truly and accurately depicted how he looked after he was shot.

¶ 16 Claude admitted that he gave had a recorded interview at the hospital on February 22, 2017. Present during that interview were two police detectives and an ASA. He stated that he signed a photograph of the defendant during the interview and told the ASA that the defendant was the man who shot him, but contended that he did so only because family members had told him that is what happened. He also acknowledged that he told the investigator that, after his wife told him to "watch out," he saw "MC" approaching from the side of a nearby abandoned house and begin shooting. But again he testified "that wasn't what happened." He stated that he never saw the defendant at the Brookline address and "made up" seeing a "[c]hrome and black" gun. He acknowledged that he never told the investigators that he identified the defendant as the shooter because that is what other people had told him. Claude admitted taking Norco when he gave the interview,

¶ 17 The State then questioned Claude regarding a purported telephone conversation he had with the defendant on November 2, 2017, the week before trial. When the State asked if he knew

who Sherry Newman was, Claude stated that the knew her to be the defendant's wife. Claude denied speaking with the defendant and using Sherry's cellular telephone. He denied ever promising the defendant that neither he nor his wife would testify against him or telling the defendant that he would go to Las Vegas or his sister's house in Minnesota.

¶ 18    On cross-examination, Claude stated he was in shock when he was shot and believed he was going to die. He stated that he was initially transported to the hospital in a van with six other people who were all discussing the shooting and stating who they believed participated in the shooting. A police car pulled the van over, and he was then placed in an ambulance where he was questioned about the shooting. According to Claude, he told the police "MC" shot him based on the conversations he had while in the van and because he was "mad" that he had been shot. The officers did not ask him to swear to tell the truth about who shot him when he made his statements.

¶ 19    Tamicca testified that she was married to Claude and lived on Brookline Street with her grandmother and children. She stated that, on February 20, 2017, she and Claude were outside on the street with "a lot of people" when Claude, Darryl, and Juane were all shot. According to Tamicca, immediately before the shooting she was retrieving keys from Claude, and when she "turned [her] back and stepped like two steps, the shots went off," and she hid under her car.

¶ 20    Tamicca testified that she did not see anyone approach Claude with a gun before the shooting. After the shooting, she saw a person "in all black" but did not see the person's face. She did not know how many shots were fired, but "[i]t sounded like it wasn't going to stop." After the shooting, she heard Claude yelling that he was "hit," so she got out from under the car and went to where he was lying. As the group tried to take Claude to the hospital in a van, the police stopped the vehicle and had Claude transported to the hospital in an ambulance.

¶ 21    Tamicca admitted that she had a conversation on February 22, 2017, at the hospital with a police detective and ASA Kevin Sobczyk and that consented to having the interview video recorded. She testified that she told the interviewers what happened during the shooting and identified a photograph of the defendant which she signed during the interview. She initially stated that she never told the investigators that the defendant was the shooter. Later, she acknowledged that she told the interviewers that it was the defendant that shot her husband, because she "probably wanted to get [the] interview over with." She also stated that she "probably" told the interviewers that she saw the defendant come down the driveway from a nearby house and warned Claude to "watch out." According to Tamicca, she did not see the defendant with a gun or see him shoot anybody. She testified that she was not be able to see anybody's face outside her home at night. She did recall telling the interviewers that the only person she saw with a gun was the defendant. She acknowledged that she had previously been convicted for theft, identity theft, and possession of a controlled substance.

¶ 22    On cross-examination, Tamicca stated that, when she got into the van to take Claude to the hospital, "everybody was panicking," but there was no discussion in the van as to who might have been the shooter. She testified that, when the police arrived and placed Claude in an ambulance, she was not allowed to ride with him. Tamicca stated that she spoke with police officers at the hospital who told her that "they heard Michael Caraway did the shooting." According to Tamicca, she informed the officers that she did not know who shot Claude but believed them when they told her that the defendant was responsible. She stated that she gave a recorded statement the following day.

¶ 23    ASA Sobczyk testified that, on February 22, 2017, he interviewed both Claude and Tamicca and both consented to have their statements video recorded. Portions of both video-recorded statements were played for the jury.

¶ 24    In his recorded statement, Claude identified a photograph of the defendant who he knew as "MC" and signed and dated the photograph. He stated that he had known MC for six or seven years. According to Claude, he was playing "Madden" at his cousin's house in the early afternoon of February 20, 2017, and saw MC "pull*** up" and try to run over his cousin. The defendant exited the car with a gun for "like two minutes" before getting back in the car and driving away. Later, Claude went to the Brookline address, where he stood outside the house with many other individuals. His wife met him on the sidewalk and told him to "watch out," at which point he saw the defendant come from the direction of an abandoned house. Claude stated that the defendant then shot him in the arm with a chrome and black gun from about 10 feet away. According to Claude, he heard approximately 30 gunshots and was "hit" twice in the chest and once in the arm. Claude stated that he had not been threatened or promised anything before giving his statement and gave the statement freely and voluntarily. He admitted that he was taking medication for nausea prior to giving the statement and denied that the medication affected his memory of the incident.

¶ 25    On cross-examination, ASA Sobczyk stated that he asked another officer to be present at the interview to serve as a "prover," so that "it doesn't necessarily have to come down to a situation of he said/she said, or he said/he said." Sobczyk explained that the statement was a "summarized version of our conversations I had [sic] with him earlier about whether in some way his identification was somehow compromised by outside sources."

¶ 26    In her video-recorded statement, Tamicca stated that, on February 20, 2017, she lived on Brookline Street in Chicago Heights. She identified a photograph of the defendant, whom she knew as "MC," and stated that he shot her husband and his two friends on February 20, 2017. According to Tamicca, she was outside her house talking with "a bunch of" Claude's friends just before 9:40 p.m. when she saw the defendant approach from a vacant house nearby. She was standing next to Claude and told him to "watch out." She stated that. when the shooting started, both she and Claude "took off running." She saw that the defendant had a gun but did not see what it looked like. Tamicca stated that the defendant was the only person she saw with a gun. She heard approximately 10 gunshots, which sounded like "it didn't stop." She hid under her car and only got out when she heard Claude yelling that he had been shot. She stated that no one threatened or promised her anything in exchange for her statement, which she gave freely and voluntarily.

¶ 27    On cross-examination, ASA Sobczyk stated he had a prior non-recorded interview with Tamicca which lasted approximately ten to fifteen minutes. He never asked her if a police officer had told her that they arrested the defendant because he was the shooter. ASA Sobczyk stated that he spoke with Detective Henderson prior to Tamicca's interview, and Henderson told him that Claude had identified the defendant as the shooter.

¶ 28    Detective William Henderson testified that he was a member of the Chicago Heights police department, working for the South Suburban Major Crimes Task Force, and had responded to the scene of the shooting. He testified that when he arrived he saw Claude, whom he had met on previous occasions, in an ambulance. Detective Henderson stated that he asked Claude who shot him, and Claude responded "MC shot me." Claude stated MC was Michael Caraway. According

to Detective Henderson, he asked Claude about his his condition, and Claude responded "I think I'm going to die."

¶ 29    On cross-examination, Detective Henderson stated that he first saw Claude inside the ambulance and did not see him transferred from a van. He admitted that he never asked Claude whether he personally saw the defendant shoot him or whether anyone else told him that the defendant shot him. During his interview of Claude at the hospital, he never inquired who, if anyone, told Claude that the defendant was the shooter.

¶ 30    On redirect examination, Detective Henderson testified that he was present during the video-recorded interview of Claude, during which he heard Claude state that he saw MC approach and open fire. He stated that he did not ask Claude whether anybody told him that the defendant was the shooter. On recross examination, he stated that he assumed that Claude told him the truth about the shooting.

¶ 31    Detective Dennis Karner testified that he was a member of the Flossmoor police department and responded to the scene of the shooting on February 20, 2017. As part of the investigation, he went to Stroger Hospital to check on the status of the victims and interview witnesses. He attempted to interview "JeJuan Taylor," one of the victims, but he was "very uncooperative." He stated that he also interviewed Darryl and asked him who had shot him. Darryl responded that he did not know.

¶ 32    Kimberly Hofsteadter testified that she worked for the Cook County Department of Corrections in the telephone monitoring unit. She was trained in the Securus System which allows inmates to call their family and friends after they have been registered in the system. She stated that all calls by inmates are recorded and maintained on a server in Texas. Each phone call placed

by an inmate includes a prompt at the beginning which informs the parties that the phone call is being recorded and monitored.

¶ 33    According to Hofsteadter, she reviewed phone calls made by the defendant, including a phone call placed on November 2, 2017. She also reviewed the call detail reports which contain information about the caller and duration of the phone call. Defendant's call detail report indicated that a call was placed on November 2, 2017, starting at 4:41 p.m. and ending at 5:11 p.m.

¶ 34    The State played portions of the November 2 phone call recording for the jury. In that recording, the defendant stated that he was getting ready to go to trial "on Monday." The other man said he "didn't want to be in their presence period," and was not "worried about catching a warrant" because he had a "crib" to go to. The man said he was going to go to Minnesota with his sister. The defendant discussed "the last payment" and stated that he was going to tell the "girl to grab that tomorrow" but "we go Monday." The man said "you got my word" that neither I nor "the missus" would be there "on Monday."

¶ 35    On redirect examination, Hofsteadter testified that the conversations in the recordings were from a call registered to the defendant. On recross examination, she admitted that she did not know who the parties to the conversations were.

¶ 36    Detective Blake Naylor testified that he was a member of the Chicago Heights police department and was assigned to the South Suburban Major Crimes Task Force. During the early morning hours of February 21, 2017, he was at a location in Sauk Village, Illinois in an undercover vehicle when he received instructions to curb a particular vehicle with a passenger identified in court as the defendant. According to Detective Naylor, when the vehicle in which the defendant

was riding stopped, the defendant exited the vehicle, looked "straight" at the officers, and then ran northbound. Officers called for him to stop and then gave chase.

¶ 37    The officers called for assistance from a canine unit to locate the defendant. Detective Naylor testified that, with help from the dog, the defendant was found in the backyard of a house in between a shed and a fence, lying face down on the ground. He was then taken into custody.

¶ 38    Detective Naylor also testified that he knew Claude and had previous conversations with him. Detective Naylor listened to the recording of the November 2, 2017 phone call and testified that he recognized Claude's voice from the recording. On cross-examination, Detective Naylor stated that his most recent contact with Claude was "maybe a month and a half" prior to trial, and he admitted that was never trained in voice recognition.

¶ 39    After the State rested, the defendant called Chicago police officer Sean Grosvenor as a witness. Officer Grosvenor testified that, on February 20, 2017, he was employed as a crime scene investigator for the South Suburban Major Crimes Task Force. As part of his duties, Officer Grosvenor located and secured evidence for examination by the Illinois State Police. He identified photographs of the Brookline residence with markings for spent shell casings and a discarded firearm, as well "an area of blood-like stain." According to Officer Grosvenor, the "grip and trigger" of the gun were swabbed with a cotton swab to collect any possible latent material that might lead to a DNA identification. Officer Grosvenor identified a bloodlike substance in the driveway of the Brookline residence and inside a white minivan parked across the street.

¶ 40    In closing, the State argued *inter alia* that the defendant shot Claude and Darryl, causing great bodily harm. The State pointed out that Darryl's arm bone was shattered between his shoulder

and elbow and "didn't heal properly and it looked like it was bent the wrong way," and Claude was shot three times with one bullet puncturing his lung, and another just missing his heart.

¶ 41 Defense counsel argued in closing that the witnesses were not credible and that no physical evidence linked the defendant to the crime scene despite the firearm and shell casings being recovered by the police.

¶ 42 The jury found defendant guilty of attempt first degree murder of Claude during which he personally discharged a firearm causing great bodily harm, and guilty of aggravated battery with a firearm of Claude and Darryl. The jury found defendant not guilty of either count of attempt first degree murder of Darryl.

¶ 43 The defendant subsequently filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. The motion contained a handwritten paragraph, stating: "The defendant, Michael Caraway, alleges ineffective assistance of counsel in that defense counsel did not exclude from the jury certain jurors who expressed they could not be fair based upon members of their families having been shot." The paragraph was signed by the defendant. When arguing the motion, defense counsel informed the court that he "had [defendant] sign that and [counsel would] make the argument for him." Counsel argued that the defendant remembered "a few jurors," who indicated that they could not be fair or impartial because members of their family had been shot. Counsel also informed the court that the defendant also recalled counsel asking to exclude one of the jurors for cause "and that didn't occur," which the defendant believed was prejudicial to his case. The State responded to all the issues raised in the defendant's motion, asserting that all jurors indicated "that they could be fair." The court denied the motion without addressing the defendant or expressing its reasoning on the record.

¶ 44    The case proceeded to sentencing. In aggravation, the State argued the following:

> "[T]here is mandatory consecutive sentencing as to the charges. And that's because under D1 one of the offenses the defendant was convicted of is a class X felony and the defendant inflicted severe bodily harm. The jurors found that there was great bodily harm."

The State further argued "the attempt murder personally discharging, cause great bodily harm that's 6 plus 25 so 31 minimum to life. So the minimum would be 37." Defense counsel did not contest the consecutive sentencing but disagreed as to the sentencing range described by the State.

¶ 45    The court sentenced the defendant to a total of 44 years' imprisonment. In pronouncing sentence, the court merged the counts related to Claude (Counts III & VII) into the attempt murder count (Count IV) and sentenced the defendant to 37 years' imprisonment on that count. The court also sentenced the defendant to a consecutive term of seven years' imprisonment for the aggravated battery with a firearm of Darryl (Count XIV). In imposing sentence, the court indicated it considered the factors in aggravation, including the defendant's prior convictions, and also considered the factors in mitigation. The trial court made no specific findings on the record. The court denied the defendant's oral motion for reconsideration. This appeal followed. Subsequent to the filing of the instant appeal, the defendant's prior convictions in an unrelated matter were reversed on appeal. See *People v. Caraway,* 2021 IL App (1st) 172412-U.

¶ 46    We first consider the defendant's argument that he should receive a new trial because the trial court erred when it failed to ask one of the jurors whether he understood and accepted the principles set forth in Illinois Supreme Court Rule 431(b). The defendant concedes that he neither objected to the trial court's failure to comply with Rule 431(b) nor did he raised the issue in a motion for a new trial. See *People v. Thompson*, 238 Ill. 2d 598, 611-612 (2010) ("To preserve a

claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion."). Nevertheless, the defendant argues that we should review the error under the first prong of the plain error doctrine. See *People v. Sebby*, 2017 IL 119445, ¶¶ 51-52 (Rule 431(b) violations are reviewed under the first prong of the plain error doctrine). The initial consideration in this analysis is whether a clear and obvious error occurred. *Thompson*, 238 Ill. 2d at 613.

¶ 47    Supreme Court Rule 431(b) provides that, during *voir dire* examination of prospective jurors, a trial court shall ask each potential juror, individually or in a group, whether the juror understands and accepts that: (1) the defendant is presumed innocent of the charges against him; (2) the State must prove the defendant guilty beyond a reasonable doubt before the defendant can be convicted; (3) the defendant is not required to offer any evidence on his own behalf; and (4) if a defendant does not testify, it cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Each of these specific questions "goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury." *People v. Zehr*, 103 Ill. 2d 472, 476 (1984). Although the rule mandates a specific question and response process, where the trial court asks each juror whether he or she understands and accepts each of the principles in the rule, it is not required to use the specific language of the rule in instructing the prospective jurors. *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 36. The issue as to whether the trial court violated Rule 431(b) involves construction of the rule, controlled by the same principles applicable to the construction of statutes. *Thompson*, 238 Ill. 2d at 606. "The proper interpretation of our supreme court rules is reviewed *de novo*." *Id*.

¶ 48    The defendant asserts that the trial court in this case failed to question juror J.Z. about whether he understood and accepted any of the principles outlined in Rule 431(b). We agree that

from the record before us, each juror except J.Z. was individually questioned as to whether he or she understood and accepted each of the principles set forth in Rule 431(b). Prior to individual questioning, the group was informed of each of the principles outlined in the Rule. The court asked whether the potential jurors "disagreed" with the principles or, with the statement that defendant did not have to testify. The trial court asked "[w]ould any of you hold the fact that a defendant did not testify at trial against that person?" These statements were equivalent to asking about potential jurors' acceptance of the enumerated principles. See *People v. Wilmington*, 2013 IL 112938, ¶ 32. However, the trial court failed to ask the jurors during group questioning whether they understood the principles. See *id*. Although the court questioned each juror individually about whether he or she understood and accepted the principles, the record indicates the court did not question juror J.Z. about whether he understood the principles. Accordingly, error occurred.

¶ 49    That said, we find the error did not rise to the level of plain error because the evidence against the defendant was not closely balanced. See *Sebby*, 2017 IL 119445, ¶ 68. Here, three separate witnesses (Darryl, Claude, and Tamicca) provided police with recorded statements shortly after the incident, identifying the defendant, with whom they were familiar, as the shooter. These statements were consistent regarding the sequence of events during the shooting. Although each witness recanted these statements, the State impeached each witness with his or her prior recorded statements which were then admitted as substantive evidence.

¶ 50    Even in the absence of corroborative evidence, recanted prior inconsistent statements can support a conviction. See *People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 23; *People v. Craig*, 334 Ill. App 3d 426, 438 (2002). Further, the State presented evidence regarding a telephone conversation between the defendant and Claude where Claude informed the defendant he was

planning to stay with his sister in Minnesota, and that he and his wife would not "be there" on "Monday." The defendant also mentioned "payment" in this phone call. Additionally, Detective Naylor testified that defendant fled from the police who gave chase using a police dog to capture him. Flight is "generally considered some evidence of a guilty mind," and when considered with all the other evidence, "is a circumstance that a factfinder may consider as tending to prove guilt." *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 64. In sum, we find the evidence presented was not so closely balanced that the court's error in questioning juror J.Z alone may have tipped the scales in favor of the State and, therefore, any error by the trial court in that regard does not rise to the level of plain error. See *Sebby*, 2017 IL 119445, ¶ 78. Consequently, we reject defendant's argument that the trial court's failure to properly question J.Z is grounds for reversal of his convictions and remandment for a new trial.

¶ 51    The defendant next contends that his case should be remanded for a preliminary *Krankel* inquiry into his allegations of ineffective assistance of counsel. Specifically, he argues that the trial court failed to conduct such an inquiry when it ruled on his motion for a new trial, which included his *pro se* allegation of counsel's ineffectiveness based on counsel's failure to exclude jurors who indicated they could not be fair or impartial because members of their family had been shot. The defendant points out that the court denied the motion without commenting or inquiring into his claim of ineffective assistance.

¶ 52    The State responds that it has "no quarrel with the legal authority cited in defendant's brief, however, [that authority is] simply inapplicable to the facts of this case where no *pro se* claim was never made, contrary to defendant's claim." In support of that argument, the State maintains that the law is clear that only a *pro se* claim of ineffective assistance of counsel requires an inquiry into

the claim and there is no legal authority to support defendant's claim that a preliminary *Krankel* inquiry is required for an assertion included in a motion for a new trial filed by counsel. Under the circumstances in this case, we disagree with the State's argument.

¶ 53    Under *Krankel* and its progeny, when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel, the trial court must conduct an inquiry into the underlying factual basis of defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003); *People v. Ayres*, 2017 IL 120071, ¶ 11. "[A]n attorney can raise the issue of his own ineffectiveness only if he does so clearly and at the direction of the defendant," and he must alert the court that he is raising the issue at the defendant's direction. *People v. Bates*, 2019 IL 124143, ¶ 33. The trial court need not appoint new counsel every time a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel but should first examine its factual basis. *People v. Jackson*, 2020 IL 124112, ¶ 97. If the defendant's claim indicates possible neglect by trial counsel, the trial court must appoint new counsel to argue the claim of ineffective assistance. *Moore*, 207 Ill. 2d at 78. However, if the defendant's claim lacks merit or concerns solely trial strategy, the court may deny the motion and need not appoint new counsel. *Id.*

¶ 54    "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id.* A brief discussion between the trial court and defendant may suffice, and the court may base its evaluation of the claim on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's claims on their face. *Id.* at 78-79. To trigger a *Krankel* inquiry, "a defendant need only bring his claim to the court's attention." *Ayres*, 2017 IL 120071, ¶ 19. Whether

defendant sufficiently alleged ineffective assistance of counsel to warrant a *Krankel* inquiry is a question of law that we review *de novo*. *People v. Taylor*, 237 Ill. 2d 68, 75 (2010).

¶ 55    Here, the record shows that the defendant raised an ineffectiveness claim sufficient to trigger a preliminary *Krankel* inquiry. In *Bates*, the supreme court explained that:

> "the trial court is requited to inquire into counsel's effectiveness only upon a clear claim of ineffective assistance by a *pro se* defendant or by an attorney at the defendant's direction. Thus, an attorney can raise the issue of his own ineffectiveness only if he does so clearly and at the direction of the defendant. He must also alert the court that he is raising the claim at the defendant's direction." 2019 IL 124143, ¶ 33.

In this case, the defendant's motion for a new trial included a handwritten paragraph at the end of the motion, describing the ineffective assistance of counsel claim and which was signed by the defendant, indicating that he was raising that claim *pro se*. Defense counsel informed the court that the defendant signed the handwritten portion of the motion and that he agreed "to make the argument for him." As such, although counsel raised the issue of his own ineffectiveness it was clearly done at defendant's direction which, under *Bates*, was sufficient to trigger a preliminary inquiry into defendant's *pro se* claim of ineffective assistance of counsel. 2019 IL 124143, ¶ 33; see also *People v. Downing*, 2019 IL App (1st) 170329, ¶¶ 26-28 (a *Krankel* inquiry is triggered when the defendant "speak[s] through counsel either by drafting a written post-trial motion and asking counsel to submit it, or by directing counsel to raise the issue orally.") (citations omitted); *People v. Rhodes*, 2019 IL App (4th) 160917, ¶¶ 16-20 (remanding for a *Krankel* inquiry where defense counsel raised an ineffective assistance of counsel claim on behalf of defendant).

¶ 56 The trial court did not engage in any colloquy with defendant or defense counsel concerning the defendant's ineffective assistance claim and did not address it in its ruling on the posttrial motion. In this case, however, the court's failure to do so was not error. See *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 22 citing *Moore*, 207 Ill. 2d at 78-79. A trial court may base its *Krankel* decision on: (1) the trial counsel's answers and explanations; (2) a brief discussion with the defendant; *or* (3) the trial court's own knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations. *Id.* Here, the defendant's *pro se* allegation of ineffective assistance is positively rebutted by the record.

¶ 57 The record in this case establishes that the trial court heard counsel's argument regarding defendant's claim of ineffectiveness and was in a position to evaluate the insufficiency of the claim on its face. Defendant claimed that trial counsel failed to "exclude from the jury certain jurors who expressed they could not be fair based upon members of their families having been shot." However, the assertion is positively rebutted by the record of the trial court's *voir dire* of the jury venire and trial counsel's actions. Although several potential jurors indicated that they knew someone who had been shot, all except prospective juror S.S., indicated that they could be fair and impartial. S.S. indicated that the fact that she knew someone who had been shot "could" affect her ability to be impartial and answered "I just don't know" when asked if it would enter into her decision making. Contrary to defendant's assertion, however, defense counsel did not fail to "exclude" this potential juror. Rather, defense counsel moved that S.S. be excluded for cause; and when that motion was denied, he used a peremptory challenge to strike the prospective juror. The trial court, which presided over jury selection, was obviously aware of these circumstances and could determine that defendant's claim was meritless on its face. The trial court which observed

trial counsel's performance during jury selection was well positioned to rule on defendant's claim of ineffectiveness without additional inquiry. *Moore*, 207 Ill. 2d at 78-79 (a trial court may base its evaluation of a defendant's claim of ineffectiveness on its knowledge of defense counsel's performance at trial). Likewise, we find the record rebuts defendant's claim of ineffective assistance. Accordingly, we reject defendant's claim that the trial court failed to conduct an adequate *Krankel* inquiry.

¶ 58    In a supplemental brief filed by the defendant in this appeal with leave of court, he argues that his sentences of 37 years' imprisonment for attempt murder and seven years' imprisonment for aggravated battery with a firearm must be vacated and the case remanded for resentencing on both convictions due to the trial court's consideration in aggravation his convictions in an unrelated case which were subsequently reversed on appeal. See *Caraway,* 2021 IL App (1st) 172412-U. On this issue, we agree. As the defendant correctly argues, sentences resting in part on subsequently reversed convictions in an unrelated case must be vacated and the case remanded for resentencing. See *United States v. Tucker,* 404 U.S. 443, 447-49, 92 S. Ct. 589, 30 L. Ed. 592 (1972).

¶ 59    In his initial brief filed in this appeal, defendant also argued that the trial court's order that his sentences run consecutively must also be vacated and the matter remanded for a determination of the propriety of consecutive sentences due to the trial court's failure to make an explicit finding of severe bodily injury for either the attempt murder of Claude or the aggravated battery with a firearm of Darryl. The defendant concedes that he did not raise this sentencing issue before the trial court or in a post-trial motion. Nevertheless, he requests we review his claim under either prong of the plain error doctrine or, in the alternative, as an ineffective assistance of counsel claim.

¶ 60     Sentencing issues raised for the first time on appeal may be reviewed under the plain-error doctrine. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 11. In the sentencing context, a reviewing court may address a forfeited claim if a clear and obvious error occurred and either (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so serious that it deprived the defendant of a fair sentencing hearing. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). A trial court's improper imposition of consecutive sentences is plain error under the second prong of the plain error doctrine, because it affects a defendant's substantial rights. *People v. Lashley*, 2016 IL App (1st) 133401, ¶ 68. Again, the initial consideration in this analysis is whether a clear and obvious error occurred at all. *Hillier*, 237 Ill. 2d at 545. Here, we find the court erred in imposing consecutive sentences without a finding of severe bodily injury.

¶ 61     Under the Unified Code of Corrections, when a court imposes multiple sentences at the same time, generally the sentences must run concurrently. 730 ILCS 5/5-8-4(a) (West 2016). Relevant here is an exception to this rule which mandates that a court impose consecutive sentencing when one of the offenses for which the defendant has been convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury. 730 ILCS 5/5-8-4(d)(1) (West 2016). In this case, the defendant was convicted of attempt first degree murder and aggravated battery with a firearm, both Class X offenses. See 720 ILCS 5/8-4(c)(1) (West 2016); 720 ILCS 5/12-3.05(e)(1), (h) (West 2016). However, the trial court never made a specific finding of severe bodily injury necessary to support consecutive sentences. Absent such a finding, "we must not engage in our own assessment of the facts and the evidence to determine whether consecutive sentences were required under section 5-8-4(d)(1) of the Code." *People v Alvarez*, 2016 IL App (2d) 140364, ¶ 28 (citing *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 62    We are not persuaded by the State's argument that consecutive sentences in this case is appropriate based upon the jury's determination that the victims suffered great bodily harm. The terms "great bodily harm" and "severe bodily injury" are not synonymous. "Great bodily harm" defines the offense of aggravated battery; whereas, "severe bodily injury" is a prerequisite to consecutive sentencing. *Alverez*, 2016 IL App (2d) 140364, ¶ 23; *People v. Williams*, 335 Ill. App. 3d 596, 599-600 (2002). "[S]evere bodily injury" requires a degree of harm to the victim that is "something more" than that required for the offense of aggravated battery. Id. A finding of "great bodily harm" does not necessarily or automatically result in a finding of "severe bodily injury." *Alvarez*, 2016 IL App (2d) 140364, ¶ 24. We find that, because the trial court did not make a factual finding of severe bodily injury, defendant has established plain error under the second prong of the analysis, and the matter must be remanded for the trial court's determination as to whether the defendant inflicted severe bodily injury requiring the imposition of consecutive sentences.

¶ 63    Based upon the foregoing analysis, we affirm defendant's convictions for attempt murder and aggravated battery with a firearm, vacate the defendant's sentences on both convictions, and remand the case to the circuit court for resentencing and a determination of whether the defendant inflicted severe bodily injury requiring the imposition of consecutive sentences.

¶ 64    Affirmed in part and vacated in part; cause remanded.